## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09 B 41021 |
| BRIDGEVIEW AEROSOL, LLC, et al., | ) | |
| | ) | |
| Debtors. | ) | Chapter 11 |
| ———————————————— | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 11 A 2299 |
| | ) | |
| v. | ) | |
| | ) | |
| THE FOUNTAINHEAD GROUP, INC., JOHN F. ROMANO, LINDA E. ROMANO, and BUNNO BOARDING, LLC, | ) | Judge Pamela S. Hollis |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter comes before the court following trial on the complaint filed by the Official

Committee of Unsecured Creditors of Bridgeview Aerosol, LLC (the "*Committee*") against John

Romano and Linda Romano ("*John*," "*Linda*" or the "*Romanos*") and two corporate entities

controlled by them, The Fountainhead Group, Inc. ("*Fountainhead*") and Bunno Boarding, LLC

("*Bunno*") (collectively, "*Defendants*"). The court held a four day trial, taking testimony from

numerous witnesses and admitting dozens of exhibits into evidence. Having reviewed all of the

submitted material, the court will enter judgment in favor of Defendants on Counts I (in part), II,

III, IV and V. The court will enter judgment in favor of Plaintiffs on Counts I (in part), VI, VII,

VIII, IX and X.

## JURISDICTION

Under 28 U.S.C. § 1334, district courts have original and exclusive jurisdiction of all

cases under Title 11.  The underlying bankruptcy case was automatically referred to this court

pursuant to Internal Operating Procedure 15(a) of the United States District Court for the

Northern District of Illinois, as authorized by 28 U.S.C. § 157(a).  This adversary proceeding

was commenced by the filing of the Committee's complaint on October 28, 2011, four months

after the Supreme Court's decision in Stern v. Marshall, ___ U.S. ___, 131 S. Ct. 2594 (2011)

was issued.  As noted by the Court in Stern:

> The manner in which a bankruptcy judge may act on a referred proceeding
> depends on the type of proceeding involved.  Bankruptcy judges may hear and
> enter final judgments in all core proceedings arising under title 11, or arising in a
> case under title 11.  § 157(b)(1).  Core proceedings include, but are not limited to
> 16 different types of matters [listed in § 157(b)(2)].

Id. at 2603 (internal quotation marks omitted).

The Stern Court went on to note that "[i]n past cases, we have suggested that a

proceeding's 'core' status alone authorizes a bankruptcy judge, as a statutory matter, to enter

final judgment in the proceeding."  Id. at 2604.  It then concluded that although § 157(b)

permitted the bankruptcy court to enter final judgment on a particular category of core claims,

"Article III of the Constitution does not."  Id. at 2608.  This type of core claim became known as

a Stern claim – "a claim designated for final adjudication in the bankruptcy court as a statutory

matter, but prohibited from proceeding in that way as a constitutional matter."  Executive

Benefits Ins. Agency v. Arkison, ___ U.S. ___, 134 S. Ct. 2165, 2170 (2014) (footnote omitted).

The ten counts in the instant proceeding sound in breach of fiduciary duty as well as in

avoidance and recovery of fraudulent and preferential transfers.  Until June of this year, this

court's authority to resolve most of these claims was in question.  If the claims were non-core,

the court could have submitted proposed findings of fact and conclusions of law to the district

2

court. See 28 U.S.C. § 157(c)(1). But the parties admitted that these claims were core. Therefore, § 157(c)(1) did not permit the issuance of proposed findings and conclusions. And although § 157(b) would have permitted entry of a final judgment on these core claims, the Constitution would not.

This conundrum has been locally referred to as "the Ortiz hole," so named for the case that explained that where a claim qualifies as a core proceeding, it does not fit under § 157(c)(1) and thus proposed findings of fact and conclusions of law cannot be issued, see Ortiz v. Aurora Health Care, Inc. (In re Ortiz), 665 F.3d 906 (7th Cir. 2011).

The depth of the Ortiz hole was illustrated in Wellness Int'l Network, Ltd. v. Sharif, 727 F.3d 751 (7th Cir. 2013),[1] a decision issued just ten days before the parties submitted their post-trial briefs. At a status hearing held two weeks later, this court explained that in light of the Seventh Circuit's Wellness decision, it could not begin drafting an opinion:

> You keep thinking there is an option to do a report and recommendation. Wellness said explicitly, there is no option, okay? And they said the only way to handle this is to withdraw the reference, of course not addressing those cases where a judge has already completely tried the case.
> . . . .
> If it's a core structurally deficient situation, which is what this is . . . I don't think there is any way out of that based on what I see. We have no authority to do what you suggested.

**Hr'g Tr. 4:15–21, 5:21–6:1, Sept. 5, 2013.**

Fortunately, a very recent decision from the Supreme Court put to rest all questions as to this court's constitutional authority to enter a final judgment on every one of these claims. As the Court ruled earlier this year in overturning the Seventh Circuit, "Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge." Wellness Int'l Network, Ltd. v. Sharif, ___ U.S. ___, 135 S. Ct. 1932, 1939 (2015). By contrast,

---

[1] This is not a full citation, as will be explained in the next paragraph.

the Court noted, "Stern – like its predecessor, Northern Pipeline – turned on the fact that the litigant did not truly consent to resolution of the claim against it in a non-Article III forum." Id. at 1946 (quotation marks and citation omitted). See also Executive Benefits, 134 S. Ct. at 2170 n.4 ("[T]his case does not require us to address whether EBIA in fact consented to the Bankruptcy Court's adjudication of a Stern claim and whether Article III permits a bankruptcy court, with the consent of the parties, to enter final judgment on a Stern claim. We reserve that question for another day.").

It is clear that the parties to this proceeding "knowingly and voluntarily" consented to adjudication of the complaint by this court. At the very beginning of the first day of trial, the court asked: "[H]ave both sides consented to me entering a final judgment one way or the other?" **Trial Tr. vol. 1, 5:18–19, May 13, 2013**. Counsel for the Committee immediately responded that its client consented. **Id. at 5**. Counsel for the Defendants indicated that they had not considered the issue, but after consultation between attorney and client, counsel announced "[w]e consent, Your Honor." **Id. at 7:3–4**. **See also Id. at 8:23–24** ("Yes, we've already consented."). The "key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." Wellness, 135 S. Ct. at 1948 (quotation marks and citations omitted).

Having found that the parties knowingly and voluntarily consented, this court has the constitutional authority to enter a final judgment on all claims in this proceeding.

Venue is proper in this court pursuant to 28 U.S.C. § 1409(a).

## FINDINGS OF FACT

<u>The Romanos and Affiliated Entities</u>

Siblings John Romano and Linda Romano owned, controlled, managed and/or directed a network of companies. Although both John and Linda are New York residents, **Joint Stip. ¶¶ 7, 10**, they came before this court when three of their affiliated companies filed for relief under the Bankruptcy Code. All three of the affiliates are New York limited liability companies, but the first to file was Bridgeview Aerosol (*"Bridgeview"*), which did business in Illinois. Bridgeview was accompanied into bankruptcy by AeroNuevo, LLC and USAerosols, LLC (collectively, *"Debtors"*).

Bridgeview's sole member and parent company was USAerosols, and USAerosols' sole members as of Bridgeview's bankruptcy filing were John and Linda. John was USAerosols' President, and Linda served as its Senior Vice President and Secretary. **Am. Answer ¶¶ 14-17**.

USAerosols was also the sole member of AeroNuevo, of which John was the President and Linda served as Senior Vice President and Secretary. **Id. ¶¶ 21-22**.

John owned, controlled or held the power to vote the majority interest in all three of the Debtors. He and Linda were the only operating managers of Bridgeview. John served as Chief Executive Officer of Bridgeview and Linda as Vice President and Secretary. **Joint Stip. ¶¶ 8, 11; Am. Answer ¶¶ 18-19**. Linda, who graduated from the University of Virginia School of Law more than 35 years ago and practiced law continuously since her graduation, also served as general counsel for Bridgeview. **Trial Tr. vol. 3, 625, 628-29, May 16, 2013**.

Bridgeview was in the business of filling and supplying aerosol products to companies. **Am. Answer ¶ 20**. AeroNuevo owned the real estate on which Bridgeview operated. **Id. ¶ 23**.

USAerosols had no business operations other than its ownership of Bridgeview and AeroNuevo. **Joint Stip. ¶ 19.**

John was also the majority interest holder in Fountainhead. Both John and Linda were directors and officers of Fountainhead. **Id. ¶¶ 9, 12.**

John was the 100% owner of Bunno as well as an officer and director. Bunno's sole asset is a condominium located at 1212 North Lake Shore Drive, Unit 12AS, Chicago, Illinois. **Id. ¶¶ 9, 14-15.**

In April 2006, Fountainhead owned a 93.125% interest in Black Flag Brands, LLC ("*Black Flag*"). In addition to owning a controlling interest in Fountainhead, which owned nearly all of Black Flag, John was a manager of Black Flag. **Am. Answer ¶¶ 24, 29-30.**

Sale of Inventory to Black Flag

The Romanos acquired Bridgeview from Hydrosol in the spring of 2006. **Trial Tr. vol. 2, 379-80, May 14, 2013.** Shortly thereafter, Bridgeview entered into a supply agreement with Black Flag (the "*2006 Supply Agreement*"); John executed the agreement on Black Flag's behalf. **Id. at 381-82; Pl. Ex. 4.** Under the 2006 Supply Agreement, Bridgeview manufactured, processed, packaged and supplied Black Flag with various aerosol products. **Am. Answer ¶ 33.**

The 2006 Supply Agreement provided that "[Black Flag] shall pay [Bridgeview's] invoices within forty five (45) days of invoice date." **Pl. Ex. 4 at 8, ¶ 31; Trial Tr. vol. 2, 383.**

Black Flag never paid its invoices within 45 days. **Trial Tr. vol. 1, 130.** As Bridgeview CFO Tom McGonigle described the situation, "it was always problematic because the receivable from Black Flag continued to grow and grow and grow. And to the best of my knowledge, I don't remember them ever paying within the 45-day terms." **Id. at 130:5-9.**

Although John admitted that Black Flag was not paying timely in 2007, he blamed Fountainhead's lenders. **Trial Tr. vol. 2, 386**. Since Fountainhead was in default with those lenders, it entered into forbearance agreements that imposed certain covenants on it and on Black Flag. As John remembered it, one of those covenants restricted payment to Bridgeview, although he could not recall whether the prohibition extended to new invoices or only those that were past due. **Id.** at 389.

The forbearance agreements to which John referred set up a "lockbox account" beginning with the Amendment to Forbearance Agreement entered into on May 25, 2007. **See Pl. Ex. 28 at 4, ¶ 3(f)(7)**. "Borrower shall establish deposit payment accounts with and in the name of the Bank and shall deposit all remittances to FGI and BF Brands for deposit in such accounts, which shall be used to repay any advances under the Fountainhead Revolver and/or the BF Brands Revolver." **Id.**

Black Flag's outstanding receivable made it difficult for Bridgeview to operate. McGonigle noted that "we would have to meet almost daily, we being the purchasing manager, my comptroller, and I, to figure out how much availability we had and who we can pay in order to keep the flow of raw materials in so we can keep the company open." **Trial Tr. vol. 1, 133:13-18**.

Frustrated with this situation, McGonigle complained, loudly and consistently, about the growing receivable. John eventually emailed McGonigle's supervisor on December 15, 2006:

> . . . I have received consistent feedback that Tom M[cGonigle] makes frequent comments to virtually everyone about Black Flag not paying their bills.

This is both shocking and inexcusable. Please stop him immediately!

**Pl. Ex. 6**.

As early as July 2007, Fountainhead's lenders began insisting that Black Flag's assets be sold to pay down their debt. **Trial Tr. vol. 2, 397**. Various parties, including Fountainhead, Citizens Bank and Partners Bank, entered into a Second Amendment to Forbearance Agreement on July 31, 2007. **Pl. Ex. 29**. Fountainhead agreed to provide the lenders with an executed purchase agreement for the sale of Black Flag in less than six weeks. **Id. at 4, ¶ 4(a)(1)**. None of the sale proceeds would be available to reduce Black Flag's payables. **Trial Tr. vol. 3, 572; Pl. Ex. 29 at 4, ¶ 4(a)(6)** ("No sales proceeds shall be used to pay or reduce any payables of the Borrower whose assets are subject to such sale."). This included the receivable owed to Bridgeview.

John testified that "[w]e weren't in a position to do much negotiating with the bank. These are forbearance agreements. They're telling us what we're going to do and not the other way around." **Trial Tr. vol. 2, 418:11-14**.

Eventually, the sale of a healthy Black Flag became John and Linda's strategy for bringing stability to Bridgeview's operations.

> We were doing whatever we could to protect and preserve Black Flag business [with Bridgeview] during trying financial circumstances so that we could sell the company, and part of the contingency of that sale would be a supply contract, an evergreen supply contract with Bridgeview so that they would never lose that business.

**Id. at 390:11-17**. "Our intent was to keep Black Flag going so it didn't go under because if it did, that would have very severe consequences for Bridgeview." **Id. at 393:6-8**.

While she knew that proceeds from the sale could not be used to pay down Bridgeview's receivable, Linda testified that "[t]he strategy . . . was to have a very healthy Black Flag sold to a company that would enter into a long-standing and advantageous supply agreement to Bridgeview." **Trial Tr. vol. 3, 574:22-25**. John reinforced this point: "It was an absolute condition for selling Black Flag to all the prospective suitors that what we termed the evergreen

8

supply agreement be executed between the new owners and Bridgeview Aerosol." **Trial Tr. vol. 2, 477:22–478:1**.

To that end, Bridgeview neither put Black Flag on a cash-on-delivery basis, nor did it stop shipments to Black Flag. It did nothing to reclaim the inventory that had been sold to Black Flag for which no payment had been made. It did not issue a notice of default under the Supply Agreement or threaten to terminate that agreement. Neither did Bridgeview initiate litigation to collect the outstanding payable. **Id. at 392**. As Linda described the situation, those activities "would have been devastating to . . . Black Flag when we were trying to sell Black Flag so that we could get a healthy supply agreement with the new . . . owner." **Trial Tr. vol. 3, 567:25– 568:4**.

<u>Sale of Black Flag to Homax and Creation of the 2007 Promissory Note</u>

On October 9, 2007, majority owner Fountainhead (93.125%) and minority owner Stephen Hill (6.875%) entered into an agreement to sell their ownership interests in Black Flag to Homax BF Holdings Corp. for $13,000,000. **Pl. Ex. 7**. John executed this agreement on behalf of Fountainhead as its President. **Joint Stip. ¶ 35**.

At the sale closing, $11,500,000 of the $13,192,425 sales proceeds was paid to Partners Trust and Citizens Bank to repay existing debt. John and Linda, as well as their father Eugene Romano, had personally guaranteed this indebtedness up to $2.5 million in one of the forbearance agreements. **Trial Tr. vol. 2, 397, vol. 3, 583**. The balance of the proceeds was distributed to three secured creditors (industrial development agencies or local development corporations) and to pay certain sale expenses. **Joint Stip. ¶ 36; Trial Tr. vol. 3, 584**. Fountainhead recognized a gain of $7,602,873 on the sale of Black Flag. <u>See</u> **Pl. Ex. 37 at 16**.

By the time of the sale, Black Flag owed Bridgeview approximately $4,400,000 for products and services supplied and/or provided by Bridgeview in connection with the 2006 Supply Agreement. **Joint Stip. ¶ 34**. Although John and Linda "went to Citizens and Partners [Bank] and requested that some of the [sale] proceeds go to Bridgeview . . . they absolutely would not hear of it." **Trial Tr. vol. 3, 585:12-15.**

On November 5, 2007, John executed a new supply agreement (the "*2007 Supply Agreement*"), this time on Bridgeview's behalf, between Black Flag/Homax and Bridgeview. **Joint Stip. ¶ 38**.

The terms of the new agreement required Black Flag/Homax to pay Bridgeview for new inventory within 30 days. **Pl. Ex. 9 at 13, ¶ 22**. It did not require Black Flag/Homax to pay the accumulated receivable of $4,400,000. The 2007 Supply Agreement had an initial three year term, after which it would be automatically renewed for successive one year terms unless terminated by either party by providing six months' notice before the end of the then-current term. **Id. at 3, ¶ 3.1**.

Under the 2007 Supply Agreement, Black Flag/Homax became Bridgeview's largest customer in 2008. Bridgeview sold over $9 million of product to Black Flag/Homax. This represented 14.5% of Bridgeview's total sales. The profit margin for Bridgeview on sales to Black Flag/Homax in 2008 was the highest of any customer, in excess of 10% and possibly as high as 13%. **Trial Tr. vol. 2, 473**. Black Flag/Homax was paying its invoices "within 30 days or shortly thereafter." **Trial Tr. vol. 1, 155:2-3.**

The same day that the 2007 Supply Agreement was executed, Fountainhead issued a five-year promissory note (the "*2007 Promissory Note*") in the amount of $4,104,607.27 to

Bridgeview. This represented the outstanding $4,400,000 receivable that had accumulated over the past 18 months. In other words, Fountainhead assumed Black Flag's liability, not Homax.

The 2007 Promissory Note was payable in full five years after execution, without any interest or interim payments. **Joint Stip. ¶ 39; Pl. Ex. 10**. Linda executed the 2007 Promissory Note on Fountainhead's behalf. **Joint Stip. ¶ 40; Trial Tr. vol. 3, 587**.

John could not remember whether the terms of the 2007 Promissory Note were negotiated, or whether the bank simply sent it to Fountainhead. **Trial Tr. vol. 2, 426**. "I'm sure that there were discussions with the bank at that time about this and many other issues. We weren't given a choice as to what we were going to do. We were told what we were going to do." **Id. at 428:4-8**.

Linda confirmed that John had not provided the terms of the 2007 Promissory Note. She remembered preparing it, using terms determined by Fountainhead's accountants. "The accountants, I believe, dictated the length of the note. I believe they dictated that it would be imputed interest. And somebody at Fountainhead gave me the amount." **Trial Tr. vol. 3, 592:22-25**. When asked why she laid responsibility for each of these terms on the accountants, **Id. at 587-89**, Linda responded:

> Because they were involved advising us when we were selling Black Flag, and they advised us of all the accounting treatment in connection with that sale. And this note was in connection with that sale, and the accountants were driving us – driving that. . . . [T]hey were driving the accounting provisions of the sale, and one of that – one of those things was to document the payable in a note.

**Id. at 591:21–592:9**.

No one from Fountainhead's accountants at Dannible & McKee testified at trial.

Linda believed that the benefit to Bridgeview of converting the receivable into a five year promissory note was that the obligation would be documented. If it was documented, then in the future "if we did get a bank to [re]finance [Fountainhead], we wanted to negotiate as much of a

release of funds from the refinancing proceeds as we could to pay Bridgeview." **Id.** **at 593:25–**
**594:3**.

Although Black Flag/Homax was now paying its invoices timely, the $4 million
receivable continued to affect Bridgeview's cash flow. McGonigle remembered that "[w]e
monitored our availability virtually every day. . . . [W]e would pick and choose which vendors
to pay that day to keep the flow of key raw materials coming in so that we could keep the
operations going and meet payroll." **Trial Tr. vol. 1, 165:2-10**.

In March 2008, the Debtors entered into a Credit and Security Agreement with Wells
Fargo Bank, N.A. (the "*WF Credit Agreement*"). There was a $13 million line of credit, a
$1.545 million equipment loan and a $4.125 million real estate loan. **Joint Stip. ¶ 42**. Under
the terms of the credit facility, Bridgeview could draw down up to 85% of its current receivables
and 65% of its current inventory up to the $13 million line of credit limit. **Pl. Ex. 12 at 2, ¶ 1.2**.
The WF Credit Agreement was cross-collateralized with a security interest in all of the Debtors'
assets, including the 2007 Promissory Note. **Id.** **at 12, ¶ 2**.

The $13 million line of credit "was an asset-based loan, which meant that the receivables
inventory [sic] served as part of the formula. It was 85 percent receivables, 65 percent of
inventory that generated this formula, and then that determined the availability under that $13
million line." **Trial Tr. vol. 1, 181:12-18**. McGonigle would apply the formula to the balances
of Bridgeview's receivables and inventory to determine how much Bridgeview could borrow
from Wells Fargo under the line. **Id.** **at 181**; **Pl. Ex. 12**.

The outstanding account receivable that had been accruing with Black Flag was not
included in that borrowing base. **Trial Tr. vol. 1, 182**. Receivables due from an affiliate were
ineligible, and "[a]ccounts with respect to Black Flag brands arising on or before November 7,

2007" were specifically excluded.  **Id. at 183-84**; **Pl. Ex. 12 at A-5** (defining "Eligible
Accounts").

Subordination of the 2007 Promissory Note

On April 10, 2008, Bridgeview, Fountainhead and National City Business Credit, Inc.
entered into a Subordination Agreement.  **Pl. Ex. 11**.  It was executed in connection with the
refinancing of Fountainhead's debt with this new lender, National City.  **Trial Tr. vol. 3, 595-96**.
Although John and Linda had started looking for a new source of financing in the beginning of
2007, "[i]t took a long time to find one.  We were turned down by several banks.  Literally,
National City was a lender of last resort and the only one that would issue a commitment to us."
**Id. at 634:5-8**.

The Subordination Agreement provided for a million dollar payment to Bridgeview on
the 2007 Promissory Note, but it restricted any further payment until the note matured.  **Id. at
596**; **Pl. Ex. 11**.  Furthermore, it subordinated Fountainhead's debt to Bridgeview as
memorialized by the 2007 Promissory Note to its new obligation to National City.  **Pl. Ex. 11**.
At the same time, National City obtained subordination agreements from John (to whom
Fountainhead owed $3 million), Linda (Fountainhead owed $1,487,938) and their father, Eugene
(Fountainhead owed $900,000).  **Def. Exs. 28-30**.

Committee chair Dwight Larimer testified that when Bridgeview acquired its predecessor
Hydrosol in 2006, Larimer's own company agreed to subordinate its $2 million debt as well as
write off the $1.3 million in penalties and interest that had accrued.  **Trial Tr. vol. 1, 110-11**.
"[W]e were not in a position of saying we did not want to accept a subordinated note.  I believe
the banks – that was a deal-breaker not for The Fountainhead Group, but for the banks."  **Id. at
112:15-19**.

13

Arbitration with Black Flag / Bridgeview's Financial Situation Worsens

Around March 2008, a dispute arose between Black Flag/Homax and Bridgeview

regarding purported defective products supplied by Bridgeview under the 2007 Supply

Agreement. **Joint Stip. ¶ 43**. McGonigle described the dispute as follows:

> [T]he product was leaking in the field. There were cans of finished product that
> was leaking at the Homax locations. They were also leaking in our – in the
> warehouse that we rented in Bridgeview. So basically, the cans were rusting and
> the product was coming out.

**Trial Tr. vol. 1, 187:7-13**.

In July 2008, Black Flag/Homax filed a complaint in Cook County Circuit Court against

Bridgeview relating to the allegedly defective products. **Joint Stip. ¶ 44**. Bridgeview filed a

counterclaim in which it claimed that Black Flag/Homax owed it in excess of $1,500,000 for

delivered goods and another $935,000 in unusable inventory which Black Flag/Homax

wrongfully refused to accept. **Joint Stip. ¶ 45**.

The parties agreed that the cans were leaking, but they went to court because the reason

for the leakage was in dispute. As Linda explained, "[t]he question is did the cans corrode

because of the new formula, which is what our [Bridgeview's] position was, or did the cans

corrode because Bridgeview was filling it out of order of the MOM [method of manufacturing]."

**Trial Tr. vol. 3, 598:22-25**. Bridgeview hired at least three experts who asserted that "it's not

the order of the fill, it's the new water-based formula that's causing the corrosion." **Id. at**

**598:14-16**.

As a result of this dispute, Black Flag/Homax stopped making payments under the 2007

Supply Agreement, leaving Bridgeview with an outstanding account receivable in excess of $1.5

million. **Joint Stip. ¶ 47**. The total outstanding amount was approximately $4.1 million:

"There was about 1.5 million of what we'll call good receivables that weren't being contested,

and then there was another million or so of receivables that were being contested for product that was leaking and then there was inventory as well that was specifically for the Black Flag, the Homax customer." **Trial Tr. vol. 1, 188:19-25; see also Pl. Ex. 39 at 14-15.**

Although Black Flag/Homax and Bridgeview agreed to arbitrate their disputes, **Joint Stip. ¶ 46**, this outstanding receivable had a negative impact on Bridgeview's ability to borrow under the WF Credit Agreement. "At some point in time, both the receivables and the inventory became ineligible so that it wasn't part of the borrowing base any longer so it was affecting cash flow." **Trial Tr. vol. 1, 191:16-19**.

As a result, Bridgeview was in a serious cash crunch. **Id. at 192**. McGonigle recalled that "we were having severe cash flow problems. We were having problems paying vendors. We were having problems getting raw materials in because we didn't have the availability under our line because the receivables and inventory related to Homax was being excluded." **Id. at 192:24–193:5**. "Bridgeview was in [a] serious situation," John testified. "The bank was tightening the screws on us." **Trial Tr. vol. 2, 510:14-15**.

On November 25, 2008, Bridgeview and Wells Fargo entered into a First Amendment to the WF Credit Agreement ("*First Amendment*") to address an overadvance in credit to Bridgeview in the amount of $1,900,000. **Pl. Ex. 13**. This First Amendment provided an accommodation overadvance not to exceed $1,900,000, and required that John and Linda execute personal guarantees, which they did. **Joint Stip. ¶ 48; Pl. Ex. 13 at FGI-9954, -9965–70**. The accommodation overadvance was required to be repaid in full by June 1, 2009. **Pl. Ex. 13 at FGI-9951**.

In April 2009, Bridgeview was still "struggling." **Trial Tr. vol. 1, 195**. The Committee's expert Martin Terpstra testified at trial that in his opinion, Bridgeview was

15

insolvent at least as early as December 31, 2008. **Id.** at 276; <u>see also</u> **Expert Report, Pl. Ex. 77 at 6**.

McGonigle emailed John on April 27, 2009, that Bridgeview was "in a desperate situation. If we do not have an infusion of cash in the next few days, we will have no choice but to close the doors. Suppliers are cutting us off, and we will soon have no product to sell." **Pl. Ex. 14**. John knew this meant things were very bad, because he usually did not communicate directly with McGonigle. **Trial Tr. vol. 2, 436**.

John immediately wrote back urging Tom to speak with him that afternoon. Two days later, McGonigle again wrote to John. "Bridgeview has been in a difficult financial situation ever since the ongoing litigation with Black Flag. . . . Unless we have a significant cash infusion in the next week, I do not see how Bridgeview will be able to sustain operations. . . . We desperately need a payment under the Fountainhead note." **Pl. Ex. 14**.

John wrote back within the hour. He informed McGonigle that Fountainhead "simply doesn't have the cash flow to make that happen. Even if the cash was available, Fountainhead is specifically precluded from making any payments against the [2007 Promissory N]ote under the Credit Agreement with our lender." **Pl. Ex. 14**. Fountainhead could not prepay the 2007 Promissory Note even if it wanted to, due to restrictions imposed by National City in the Subordination Agreement. **Trial Tr. vol. 2, 447; Def. Ex. 26 at 67, ¶ 7.17**.

McGonigle testified that the situation was dire. "At that point in time, it felt like we had really run out of options . . . . Wells Fargo was kind of clamping down, for lack of a better term, and we didn't really have many options. We needed cash flow to meet payroll and keep the operations going." **Trial Tr. vol. 1, 202:19–203:1**.

Later that same month, the panel in the Black Flag/Homax arbitration entered an interim award in favor of Bridgeview in the amount of $1,559,592.30 for the undisputed product. The panel also ordered Bridgeview to pay vendor McLaughlin Gormley King Company $546,465.00. **Joint Stip. ¶ 49; Pl. Ex. 74**.

Settlement of the 2007 Promissory Note

Also in April 2009, Linda communicated to Wells Fargo that a $700,000 settlement in full of the 2007 Promissory Note was necessary to allow Bridgeview to catch up on payments to suppliers in order to keep Bridgeview operating. **Joint Stip. ¶ 51**. The "financial people" – McGonigle, Dan O'Toole, Linda and Jim Siepiola, according to John – determined that this amount was required to fund operations through the course of the Black Flag litigation. **Trial Tr. vol. 2, 439**.

Wells Fargo offered a $750,000 term loan, but in return it wanted Bridgeview to acknowledge that it was in default "as a result of the Black Flag law suit and the elimination of Black Flag sales volume . . .". It also required a capital infusion of at least $1 million. **Def. Ex. 77**. Bridgeview did not agree to these terms. **Trial Tr. vol. 3, 538**.

Bridgeview desperately needed cash. Linda believed that Bridgeview would not survive without a cash infusion. **Id. at 643**. Bridgeview had an illiquid asset – the 2007 Promissory Note. Under the terms of the Subordination Agreement, which had yielded a million dollar prepayment, however, Fountainhead could not make any additional prepayments on the 2007 Promissory Note. **Trial Tr. vol. 2, 433; Pl. Ex. 11**.

National City and Wells Fargo denied that the idea of cancelling the 2007 Promissory Note in return for a cash payment originated with them, but at some point this idea was on the bargaining table. **See Etienne Dep., Pl. Ex. 99 at 15-20; Kloss Dep., Pl. Ex. 101 at 13-14**.

Kathryn Williams, who at the time was Wells Fargo's relationship manager for Bridgeview,

testified at her deposition that:

> [w]e, of course, would have preferred full payment of the note; however, you
> know, the borrower was in desperate need of cash, and, you know, per previous
> correspondence the only way that we're going to get an injection of cash was to
> discount the note. So we provided our consent to allow money to come to the
> company.

**Williams Dep., Pl. Ex. 100 at 103:22–104:4.** Williams' supervisor agreed that Wells Fargo

"understood things were tight with [Bridgeview] and they did need some sort of cash infusion."

**Kloss Dep., Pl. Ex. 101 at 14:21–22.**

The cash crunch from the Black Flag/Homax dispute was exacerbated because

Bridgeview was losing customers "[a]s [the] litigation became well known throughout the

industry." **Trial Tr. vol. 2, 503:5-6.** More than $13 million of customer revenue was lost as a

result of the litigation. **Id. at 504.**

Later in April, Linda and Wells Fargo negotiated a term sheet for a Second Amendment

to the WF Credit Agreement. **Joint Stip. ¶ 52.** On April 24, 2009, Bridgeview, USAerosols and

Wells Fargo executed the term sheet. John signed on behalf of Bridgeview and USAerosols as

CEO of both companies. **Joint Stip. ¶ 53; Pl. Ex. 20.**

Shortly thereafter, Bridgeview and Wells Fargo entered into a Second Amendment to the

WF Credit Agreement ("*Second Amendment*") wherein Wells Fargo waived existing defaults. In

addition, the Second Amendment required Bridgeview to repay any remaining overadvance on

or before July 1, 2009, and that John and Linda reaffirm their personal guarantees. **Joint Stip. ¶

54.**

Most importantly for purposes of this litigation, in the Second Amendment Wells Fargo

consented to the cancellation of the 2007 Promissory Note in exchange for the $700,000 cash

infusion. Wells Fargo's consent was necessary because it held a perfected security interest in the

2007 Promissory Note. **Trial Tr. vol. 3, 642.** The Second Amendment required Bridgeview to use that cash infusion for "working capital purposes." **Pl. Ex. 19 at 2, ¶ 2.**

The next day Linda executed, on behalf of USAerosols, the sole member of Bridgeview, a consent to settle the 2007 Promissory Note in full in exchange for an immediate cash payment of $700,000. **Joint Stip. ¶ 55.**

On May 6, 2009, Bridgeview received a $700,000 payment in settlement of the 2007 Promissory Note; Eugene Romano, who is John and Linda's father, loaned Fountainhead $700,000 to fund the settlement. **Joint Stip. ¶¶ 56, 58.** Eugene Romano took a promissory note in the amount of $700,000 made by John, Fountainhead and another related entity. **Pl. Ex. 18.**

The 2007 Promissory Note was marked as "Cancelled: Paid 5/6/09". **Joint Stip. ¶ 57.**

As a result of the cancelled note, Bridgeview recognized an offset to members' equity of approximately $2,804,326.00, according to its audited financial statements. **Pl. Ex. 39 at 13** ("As the note was between related parties, the balance forgiven in 2009 will be recorded as a reduction in the Company's equity."); **Trial Tr. vol. 1, 206-208.** According to Fountainhead's audited financial statement for 2009, it recognized a gain to paid-in capital of $2,788,781, including $47,108 of accrued interest. **Pl. Ex. 38 at 14; Trial Tr. vol. 3, 547-48.**

John believed that Bridgeview would prevail in the Black Flag/Homax litigation. **Trial Tr. vol. 2, 518.** Just a month before Bridgeview filed for relief under the Bankruptcy Code, he and Linda reaffirmed their personal guarantees yet again. **Id. at 514-17.** According to Linda, "we signed that when we were waiting for the verdict, the decision." **Trial Tr. vol. 3, 640:8-9.** Linda expected to prevail right up "[u]ntil the day of judgment." **Id. at 639:22.** "[W]e felt that the problem was in the new formula, not the method of manufacturing." **Id. at 601:13-15.**

The day of judgment came on October 5, 2009.  The arbitration panel entered a partial

award in favor of Black Flag/Homax and against Bridgeview in the amount of $3,222,697.00 and

denied any further recovery to Bridgeview.  **Joint Stip. ¶ 59; Pl. Ex. 75.**

On October 30, 2009, the Debtors filed for relief under Chapter 11 of the Bankruptcy

Code.

Wells Fargo filed a proof of claim against each of the jointly administered Debtors'

bankruptcy estates in excess of $13,215,691 on account of money loaned to the Debtors.  On or

about February 18, 2011, the Debtors sold substantially all of their assets for $8,250,000.00.

**Joint Stip. ¶¶ 63-64.**

Payments to Bunno Boarding, LLC

Within the one year immediately prior to filing for relief under Chapter 11, Bridgeview

made the following payments to Bunno (the "*Bunno Payments*"):

| CHECK # | DATE | AMOUNT |
|---------|------|--------|
| 112500 | 1/19/2009 | $   5,208.33 |
| 112625 | 1/26/2009 | $   5,208.33 |
| 112892 | 2/19/2009 | $ 10,416.66 |
| 112954 | 2/27/2009 | $   2,500.00 |
| 113196 | 3/20/2009 | $   7,916.66 |
| 113395 | 4/23/2009 | $ 10,416.66 |
| 113657 | 5/22/2009 | $ 10,416.66 |
| 113875 | 6/22/2009 | $   5,208.33 |
| 114081 | 7/24/2009 | $   5,208.33 |
| 114312 | 8/17/2009 | $   5,208.33 |

| 114358 | 8/20/2009 | $ 5,208.33 |
|---|---|---|
| 114601 | 9/15/2009 | $ 5,208.33 |
| 114739 | 10/1/2009 | $ 10,416.66 |
| 114832 | 10/8/2009 | $ 5,208.33 |
| 114868 | 10/15/2009 | $ 5,208.33 |
| 114920 | 10/23/2009 | $ 5,208.33 |
| **TOTAL** | | $104,166.60 |

**Joint Stip. ¶ 60.** The Committee demanded the return of the Bunno Payments by letter to

Bunno dated May 12, 2011. **Pl. Ex. 22.**

John was the sole member of Bunno, and the company's sole asset was a condominium

located on North Lake Shore Drive in Chicago. **Trial Tr. vol. 2, 449.**

> When I bought Bridgeview and determined that my annual salary was going to be
> $125,000 a year as the CEO, which I believe at the time made me the fifth most
> highly compensated individual at the company, I determined that I was going to
> use that money to get a condo for us to use, us and other people from
> Fountainhead while they came here to work at Bridgeview Aerosol, and I
> received advice from my tax accountant at some point that it should be an LLC. I
> don't know all the reasons why for that. That's why Bunno Boarding was
> created.

**Id. at 448:24–449:10.** Linda knew about the payments as well, and was familiar with the

arrangement between Bridgeview and Bunno. **Trial Tr. vol. 3, 623.**

McGonigle knew that these payments were "for the condo on North Lake Shore Drive for

the Romanos to use while they were in town." **Trial Tr. vol. 1, 228:4-5.** He knew that John

would not have received a W-2, because "[h]e was not an employee when I was there," but

Bridgeview may have issued a 1099 to John or to Bunno. **Id. at 228:9-14.** John did not know

whether he received a W-2 for the payments made to Bunno each year. **Trial Tr. vol. 2, 451.**

21

Even when Bridgeview was in desperate straits, the payments to Bunno were a top

priority. When asked why the payments continued when Bridgeview was having financial

problems in April 2009, McGonigle replied:

> A.   Because it always had to be made.
>
> Q.   Okay. And what made you believe that?
>
> A.   Because we would get a payment – we would get a phone call from one of
> the accountants at The Fountainhead Group, specifically Cory Jones, saying that,
> you know, we had to make a payment, that Mr. Romano was looking for the
> payment so that he could pay the – whatever, you know, expenses related to the
> condo.

**Trial Tr. vol. 1, 228:22–229:7**. Linda agreed that the payments to Bunno would not have

stopped at that time because "[t]hey were John's salary . . . . [His s]alary or salary equivalent.

That's – that was his exclusive remuneration from Bridgeview." **Trial Tr. vol. 3, 624:2-7**.

The condominium may have been where John's wife Jackie lived during frequent trips to

Chicago when John and Linda first acquired Bridgeview. **Trial Tr. vol. 1, 249-50**. No

Bridgeview employees stayed in the condominium. As John put it, "[t]hey all lived in Chicago,

so I don't see why they would." **Trial Tr. vol. 2, 456:25–457:1**. John stayed at the

condominium when he visited Bridgeview. **Id. at 456**. So did Linda, and she recalled three

other Fountainhead employees staying there as well. **Trial Tr. vol. 3, 647-48**.

In discovery, the Committee sought all facts supporting Defendants' contention that the

Bunno Payments were made in the ordinary course of business. **See Defs.' Resp. to Pl.'s

Interrog., Pl. Ex. 91 at 7**. According to Defendants' response, the payments "constituted

payment of rent for office space and accommodations for John Romano when in Chicago

performing services as CEO of Bridgeview, and thus constitute payments in the ordinary course

of business." **Id.** Defendants gave the same response when asked to state the basis for their

contention that the Bunno Payments were made according to ordinary business terms. **Id. at 8**.

## CONCLUSIONS OF LAW

Based on the facts described above, the Committee brought a ten count complaint against the Defendants sounding in breach of fiduciary duty, constructive fraud and avoidance of preferential transfers.  Each of the counts is analyzed below.

## Count I

John Romano and Linda Romano did not breach their fiduciary duties as operating managers of Bridgeview and the other Debtors, with the exception of John's actions in regard to the Bunno Payments.

The Committee alleges that John and Linda breached their fiduciary duties to Bridgeview and the other Debtors in connection with a series of transactions.  The first question to resolve is which state's law applies to the Committee's claims for breach of fiduciary duty.  The Committee's brief relies on New York law, while Defendants' brief assumes that Illinois law applies.[2]

Illinois choice of law provisions "govern this case because it was filed in Illinois."  CDX Liquidating Trust v. Venrock Associates, 640 F.3d 209, 212 (7th Cir. 2011).  Illinois follows the internal affairs doctrine, so "the law applicable to a suit against a director for breach of fiduciary duty [is] that of the state of incorporation."  Id. (citing Newell Co. v. Petersen, 758 N.E.2d 903, 923-24 (Ill. 2001)).  Since Bridgeview is a New York limited liability company, the law of the State of New York applies to the Committee's claims for breach of fiduciary duty against John and Linda.

---

[2] Defendants acknowledged this disparity in footnote 1 of their Opposition to Plaintiff's Motion to File Limited Rebuttal (EOD 82) and asserted that the standards for the fiduciary duty imposed upon managers of limited liability companies under New York and Illinois law are virtually identical.  Nevertheless, the court must clarify which law applies.

To prevail on a claim for breach of fiduciary duty under New York law, a plaintiff must prove: (1) a fiduciary duty exists; (2) the fiduciary duty was knowingly breached; and (3) damages resulted. See Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011).

John and Linda were the operating managers of Bridgeview. The fiduciary duties of a managing member of a limited liability company are the same as those applied to officers and directors of a corporation. See O'Connell v. Shallo (In re Die Fliedermaus LLC), 323 B.R. 101, 110 (Bankr. S.D.N.Y. 2005). "Directors and officers typically owe fiduciary duties to the corporation and its shareholders, which include a 'duty of care' and a 'duty of loyalty.'" Friedman v. Wahrsager, 848 F. Supp. 2d 278, 288 (E.D.N.Y. 2012) (quoting another source).

The duty of care is described in New York's Limited Liability Company Law § 409. This statute requires managers of a limited liability company to "perform his or her duties as a manager . . . in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances." N.Y. Ltd. Liab. Co. Law § 409(a); see also N.Y. Bus. Corp. Law §§ 715(h), 717(a) (prescribing same standard for officers and directors). "The primary requirement of the duty of due care is that the directors make an informed decision, having availed themselves of the advice of experts and using the available time to consider their options carefully." British Printing & Commc'n Corp. PLC v. Harcourt Brace Jovanovich, Inc., 664 F. Supp. 1519, 1530 (S.D.N.Y. 1987); see N.Y. Ltd. Liab. Co. Law § 409(b) (describing similar standard).

The duty of loyalty is not statutorily prescribed but remains applicable, at common law, to entities acting in a fiduciary capacity:

> The duty of loyalty derives from the prohibition against self-dealing that inheres in the fiduciary relationship. In addition to the statutory requirement that officers and directors act in good faith, the duty of loyalty dictates that they may not

assume and engage in the promotion of personal interests which are incompatible
with the superior interests of their corporation.

In re Perry H. Koplik & Sons, Inc., 499 B.R. 276, 289 (S.D.N.Y. 2013) (internal quotation marks

and citations omitted) aff'd, 567 F. App'x 43 (2d Cir. 2014), cert. denied sub nom. Koplik v. Fox,

___ U.S. ___, 135 S. Ct. 735 (2014).

In an action for breach of fiduciary duties, "New York's business judgment rule creates a

presumption that a corporation's directors act in good faith and in the best interests of the

corporation." Patrick v. Allen, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005) (collecting cases).

However, "[i]t is black-letter, settled law that when a corporate director or officer has an interest

in a decision, the business judgment rule does not apply." Croton River Club, Inc. v. Half Moon

Bay Homeowners Ass'n (In re Croton River Club, Inc.), 52 F.3d 41, 44 (2d Cir. 1995). The

basis for this rule has been explained as follows:

> When the directors and majority shareholders of each corporation are independent
> and negotiate at arm's length, it is more likely that the negotiations will reflect the
> full exertion of each party's bargaining power and the final terms of the
> transaction will be the best attainable. When, however, there is a common
> directorship or majority ownership, the inherent conflict of interest and the
> potential for self-dealing requires careful scrutiny of the transaction.

Alpert v. 28 Williams St. Corp., 473 N.E.2d 19, 26 (N.Y. 1984). Therefore, "[o]nce a prima

facie showing is made that directors have a self-interest in a particular corporate transaction, the

burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the

corporation and its shareholders." Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 264 (2d Cir.

1984).

The evidence in this case supports a prima facie showing that John and Linda were self-

interested. They held positions as officers, directors, operating managers or majority owners on

both sides of the transactions discussed below, with the exception of Linda in regard to the

Bunno Payments. The burden, therefore, is on the Defendants to demonstrate that each

transaction was fair and served Bridgeview's best interests.

The parties addressed these transactions in four separate groupings, and the court agrees

that this is the most efficient method for analyzing whether John and Linda breached their

fiduciary duties to Bridgeview.

Sale of Inventory to Black Flag

The Committee asserts that John and Linda breached their fiduciary duties to Bridgeview

by causing Bridgeview to transfer over $4.4 million in products and services to Black Flag in

2006 and 2007 for which Black Flag never paid. As this payable grew, Bridgeview took no

actions to slow or stop it. Bridgeview did not put Black Flag on a cash-on-delivery basis, it did

not stop shipments, and it did nothing to reclaim the inventory that had been sold to Black Flag

for which no payment had been made. It did not issue a notice of default under the 2006 Supply

Agreement or threaten to terminate that agreement. And of course, Bridgeview did not initiate

litigation to collect the outstanding payable. Instead, John and Linda determined that the best

way out of this situation was to allow the receivable to accumulate and to search for a purchaser

for Black Flag's assets. This purchaser would then enter into a new supply agreement with

Bridgeview.

Since John and Linda held positions of influence at both Bridgeview and Black Flag

during this time, the burden is on them to demonstrate that allowing the increase of this

receivable was fair and in Bridgeview's best interests.

The Committee asks whether managers who were not self-interested would have required

Black Flag to pay cash on delivery, or stopped shipping product, or brought a lawsuit to recover

the outstanding amounts. Putting Black Flag on a short leash or litigating to obtain payment

26

would certainly have been one way of dealing with the situation. We know that Bridgeview's
CFO wanted drastic action taken. He complained loudly and consistently about Bridgeview's
dire situation and the ever-increasing Black Flag receivable.

But the CFO could see only one side of the story. John and Linda tried to be creative and
to solve the problem in a manner that would benefit both Bridgeview and Black Flag. Although
they knew the situation was dire, their choice to continue shipping product from Bridgeview to
Black Flag was not the result of sticking their heads in the sand and hoping for the best. They
made a business decision that keeping Black Flag intact in order to obtain the highest possible
price at a sale with a buyer who would continue to do business with Bridgeview would be the
best outcome not just for Black Flag but for Bridgeview as well. Both John and Linda believed
that Black Flag had to keep operating and get to a sale, because if it went under "that would have
very severe consequences for Bridgeview."

The court finds John and Linda's explanation credible. To have taken harsh measures
against Black Flag would have not just jeopardized the supplier-customer relationship, it might
have led directly to Bridgeview's demise.

Instead, John and Linda determined that a sale of a healthy Black Flag was the best
solution for all parties. And while it might have had an impact on their bargaining position –
although there was no testimony one way or the other – John and Linda told all potential Black
Flag purchasers that signing a new supply agreement with Bridgeview would be a condition of
the sale.

Purchaser Homax did sign the 2007 Supply Agreement. Although it was not an
evergreen agreement, as John and Linda repeatedly asserted, it did require Homax to do business
with Bridgeview for the next three years.

27

In fact, their plan worked. Black Flag/Homax became Bridgeview's largest and most
profitable customer. John and Linda made a business decision to allow Black Flag's receivable
to accumulate rather than impose different payment or delivery terms or engage in harsh
collection tactics. This decision was both fair and in Bridgeview's best interests, and was not a
breach of John's and Linda's fiduciary duties.

Creation of the 2007 Promissory Note

An integral part of the sale of Black Flag to Homax was the conversion of the $4.4
million Bridgeview account payable into the 2007 Promissory Note. Fountainhead assumed
Black Flag's liability, not Homax. The Committee asserts that converting an overdue account
payable, which was originally incurred on 45 day terms, into a debt that was not due for five
years and on which no payments would be made during that 60 month term, was not fair and was
not in Bridgeview's best interests.

Linda remembered preparing the 2007 Promissory Note, based on terms provided by
Fountainhead's accountants. No testimony was introduced from one of Fountainhead's
accountants to rebut Linda's testimony that they told her what the terms should be – the amount,
the interest rate and the time period.

Both John and Linda consistently testified that their backs were to the wall. There was
no free cash with which to pay Bridgeview's outstanding receivable. "We weren't given a
choice as to what we were going to do. We were told what we were going to do."
Fountainhead's lenders explicitly prohibited payment of outstanding payables from the sale
proceeds.

Linda believed that the benefit to Bridgeview of converting the receivable into a five year
note was that the obligation would be documented, and they might be able to squeeze some cash
out of a future refinancing of Fountainhead's obligations. In fact, that is exactly what happened.

28

What if Black Flag had been owned by a third party with no ties to Bridgeview? What might have happened to the payable in such a circumstance? Assuming that Black Flag's lender imposed the same requirements – the proceeds had to pay off the parent company's loan, and no proceeds could be used to reduce payables – Black Flag's creditors would be in no better of a position. Indeed, would a Black Flag owner with no ties to Bridgeview have required the purchaser to sign a new supply agreement as part and parcel of the sale? Likely not.

Moreover, in consummating this transaction, John and Linda got Black Flag sold, transferred the enormous payable from Black Flag to its parent, and not incidentally preserved Black Flag's value as a customer for Bridgeview, at least for three years. In keeping Black Flag as a customer, John and Linda created tremendous value for Bridgeview. Under Homax's ownership, Black Flag was Bridgeview's largest customer in 2008. Sales of $9 million represented 14.5% of total sales, and even better, the profit margin for Bridgeview was the highest of any customer at approximately 13%.

For all of these reasons, John and Linda's actions with regard to creation of the 2007 Promissory Note were not a breach of their fiduciary duties to Bridgeview.

Subordinating the 2007 Promissory Note

On April 10, 2008, the Romanos replaced Fountainhead's credit facility. As part of the transaction, Bridgeview, Fountainhead and National City entered into a Subordination Agreement. The Romanos agreed to subordinate the 2007 Promissory Note to Fountainhead's new obligations to National City. As part of this arrangement, $1 million of the refinancing proceeds was paid to Bridgeview on the 2007 Promissory Note, reducing the outstanding balance by nearly 25%.

The Committee argues that subordinating the 2007 Promissory Note stripped Fountainhead of its ability to make future payments on it. But this argument ignores the simple fact that the 2007 Promissory Note did not come due until November 2012. Whether or not the 2007 Promissory Note was subordinated, Fountainhead was not required to make payments on it for more than four years. In return for giving up a non-existent right to payments for several years, Bridgeview got a cash infusion of a million dollars.

As the Defendants pointed out, sometimes when there is a refinancing transaction, other obligations are subordinated to induce the new lender to participate. The Committee's own chairman Dwight Larimer testified that his company agreed to subordinate its debt and to write off accrued interest and penalties in order for Bridgeview's acquisition of Hydrosol to go through. He noted that the subordination of his company's debt was a deal-breaker for the banks, and that his company was not in a position to refuse to accept a subordinated note. Sometimes managers must choose the lesser of two evils. So long as they make an informed decision, in good faith and with the degree of care that an ordinarily prudent person would use under similar circumstances, then that choice is not a breach of the manager's fiduciary duty.

At the time Black Flag's receivable was converted into the 2007 Promissory Note, Linda had hoped to get some funds to pay down that note from a future refinancing. In fact, Bridgeview did come out of Fountainhead's refinancing with a million dollars. This was a good result, considering that it should not have expected to see any money from the 2007 Promissory Note until the end of 2012.

For these reasons, John and Linda did not breach their fiduciary duties to Bridgeview in subordinating the 2007 Promissory Note.

Settling the 2007 Promissory Note

    In mid-2008, Black Flag/Homax stopped paying Bridgeview both for disputed and undisputed product. The parties went to court, and then to arbitration. Bridgeview's legal expenses mounted just as the profits from its highest-margin customer disappeared. Moreover, this Black Flag/Homax receivable limited the cash available to Bridgeview under the Wells Fargo line of credit. By the end of November 2008, about eight months after executing the WF Credit Agreement, Bridgeview was already overadvanced by $1.9 million.

    Wells Fargo agreed to amend its credit agreement to allow repayment of the overadvance, anticipating complete repayment by June 1, 2009. But by April the cash situation at Bridgeview was dire. McGonigle begged John for money, telling him that Bridgeview was "in a desperate situation. If we do not have an infusion of cash in the next few days, we will have no choice but to close the doors. Suppliers are cutting us off, and we will soon have no product to sell."

    Two days later, McGonigle wrote again: "Unless we have a significant cash infusion in the next week, I do not see how Bridgeview will be able to sustain operations. . . . We desperately need a payment under the Fountainhead note." When John told him that Fountainhead didn't have the cash or the legal ability to make a payment under the 2007 Promissory Note, McGonigle felt the company was at the end of its rope. "At that point in time, it felt like we had really run out of options . . . . Wells Fargo was kind of clamping down, for lack of a better term, and we didn't really have many options."

    Bridgeview was absolutely desperate for cash, as its own CFO warned its owners. Without a significant infusion of funds, the company was on the verge of going under.

    Backs up against the wall yet again, John and Linda sought more money from Wells Fargo but couldn't agree on the terms – the bank wanted a capital infusion of at least $1 million

in return for a $750,000 loan. Wells Fargo eventually agreed that Bridgeview would write off the 2007 Promissory Note in return for a $700,000 cash infusion.

The burden of proof is on Defendants to demonstrate that settling the 2007 Promissory Note was not just in Bridgeview's best interests, but that it was fair. Certainly it was in Bridgeview's best interests to continue operating as the arbitration proceeded, and to avoid closing its doors. Was it fair? Bridgeview was struggling, but it was because Black Flag/Homax had stopped paying for product. The Romanos truly believed that they would prevail in the litigation with Black Flag/Homax. If they could just get the company to hang on a little longer, the matter would be resolved and relations with Black Flag/Homax could be resumed. The huge receivable that Black Flag/Homax refused to pay would be paid off and Black Flag/Homax's fat profit margin would be back.

Indeed, the Romanos put their money where their mouths were by reaffirming their personal guarantees in the Second Amendment at the same time the 2007 Promissory Note was cancelled.

John and Linda had to act in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances. What were those circumstances? Bridgeview was on the edge of failure. The Wells Fargo relationship manager testified at her deposition that settling the 2007 Promissory Note was "the only way we're going to get an injection of cash."

A reasonable person might ask why, just a year prior, Bridgeview got a million dollar prepayment without any compromise to the 2007 Promissory Note. The answer is simple – the circumstances had changed. Bridgeview had, at least temporarily, lost its largest customer. It was embroiled in arbitration with that same customer. A huge receivable was outstanding and

32

the profit margins delivered by Black Flag/Homax had dried up at the same time resources were diverted to the ongoing arbitration. The future of Black Flag/Homax's relationship with Bridgeview, which looked so solid less than two years prior, hung by a thread.

Hearing repeatedly from their CFO that Bridgeview needed cash and needed it now, John and Linda opted to trade the $3.5 million 2007 Promissory Note for $700,000 in cash. The court concludes that this transaction was not unfair, considering all the circumstances, including McGonigle's warnings directly to John that Bridgeview could go under at any moment. The court is satisfied that John and Linda acted in good faith when they settled the 2007 Promissory Note, and that they took what appeared at the time to be the best of the very few available options.

<u>Payments to Bunno Boarding, LLC</u>

Bridgeview made sixteen (16) payments totaling $104,166.60 to Bunno during the one year period prior to filing for relief under Chapter 11. With two exceptions, these payments were either $5,208.33 or $10,416.66. The two exceptions were back to back payments that totaled $10,416.66.

Defendants argue that these payments represented the $125,000 John Romano received each year as compensation for services rendered as Bridgeview's CEO. In the alternative, Defendants contend that the payments were rent for the condominium Bunno owned.

As discussed more fully in Count IX below, there is no credible evidence to support a finding that the payments were either compensation or rent. Since John stood on both sides of the transaction, the burden is on John to demonstrate that making these payments to Bunno was fair and served Bridgeview's best interests.

33

There is no evidence to support a finding that paying Bunno $104,166.60 in less than a year was fair or in Bridgeview's best interests. The court finds that making these payments was a breach of John Romano's fiduciary duties to Bridgeview.

Linda, however, had no ownership interest in Bunno. Since she was not on both sides of the transaction, she is entitled to the presumption of New York's business judgment rule that she acted in good faith and in the best interests of the company. See Patrick, 355 F. Supp. 2d at 710 ("New York's business judgment rule creates a presumption that a corporation's directors act in good faith and in the best interests of the corporation" unless the director has an interest in a decision.).

While the Committee established that Linda was aware of the payments, knew of the arrangement between Bridgeview and Bunno, and understood that the payments would not stop even when Bridgeview was in dire financial straits, these facts are insufficient to show that Linda knowingly breached her fiduciary duty. There is no evidence that she had anything to do with setting up the arrangement, assuring its continuance, or giving an opinion on its legality in her role as Bridgeview's general counsel. Something more than awareness of the arrangement is required to find that Linda knowingly breached her fiduciary duty with respect to the Bunno Payments.

In summary, with the exception of the Bunno Payments, the court finds that John Romano did not breach his fiduciary duties as officer, director and manager of Bridgeview and the other Debtors. Linda Romano did not breach her fiduciary duties at all. Judgment will be entered for Defendants on Count I, except as to the Bunno Payments with regard to John.

**Count II**

John Romano and Linda Romano did not breach their fiduciary duty to preserve Bridgeview's
assets for the benefit of creditors when Bridgeview was insolvent.

"[T]he duty that directors owe to the creditors of an insolvent corporation under New
York law is defined primarily by the 'trust fund doctrine.'" RSL Comm'ns PLC v. Bildirici,
649 F. Supp. 2d 184, 202 (S.D.N.Y. 2009), aff'd, 412 F. App'x 337 (2d Cir. 2011).  They are said
to hold the corporate assets in trust for the benefit of creditors and, "[a]s such, directors of an
insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the
benefit of creditors." Id. (quotation marks and citation omitted).  This duty exists "once the
company is actually insolvent, but not while the company is merely operating in the zone of
insolvency." Alpha Capital Anstalt v. New Generation Biofuels, Inc., No. 13-CV-5586 VEC,
2014 WL 6466994, at *18 (S.D.N.Y. Nov. 18, 2014) (citations omitted).

The Committee argues that the unrebutted testimony from its expert, Martin Terpstra,
demonstrated that Bridgeview was insolvent as early as December 31, 2008, and certainly by the
time the 2007 Promissory Note was settled in April 2009.  Since the Defendants introduced no
evidence suggesting that Bridgeview was solvent after that date, the Committee asserts that
Terpstra's opinion is uncontroverted and argues that "[t]he court may not arbitrarily reject
uncontroverted evidence." Grochocinski v. Knippen (In re Knippen), 355 B.R. 710, 724 (Bankr.
N.D. Ill. 2006) (citation omitted) aff'd sub nom. Knippen v. Grochocinski, No. 07 C 1697, 2007
WL 1498906 (N.D. Ill. May 18, 2007).

Although the reasoning set forth in Knippen "does not stand for the proposition that a
Bankruptcy Court must accept all expert testimony at face value," In re McCook Metals, LLC,
No. 05 C 2990, 2007 WL 4287507, at *8 (N.D. Ill. Dec. 4, 2007) aff'd sub nom. Baldi v. Samuel

35

Son & Co., 548 F.3d 579 (7th Cir. 2008),[3] the Committee is correct that Defendants did not

introduce any evidence that would contradict Terpstra's opinion.  Instead, Terpstra's opinion is

largely consistent with other evidence presented at trial, including testimony regarding the

conditions leading to the sale of Black Flag to Homax, the importance of Black Flag/Homax's

account to Bridgeview's ability to remain in business, and how Bridgeview's financial situation

deteriorated as a result of the Black Flag/Homax litigation.

On cross examination, Defendants' counsel pointed out that Terpstra used hindsight in

valuing the Black Flag/Homax litigation:

> Q.     Okay.  Now, the other thing you did was using hindsight in 2012, you took
> the Black Flag/Homax litigation and you applied the outcome; is that correct?
>
> A.     That is correct.
>
> . . . .
>
> Q.     Well, your analysis uses hindsight and just takes the situation as it existed
> at the conclusion of the litigation and applies it to Bridgeview's position in
> December 2008; does it not?
>
> A.     Yes, it does.

Trial Tr. vol. 1, 342:21–343:16.

The Seventh Circuit warned against exactly this problem in a similar case.  "Hindsight is

wonderfully clear, but in determining the [debtor's] solvency in mid-1997 it was necessary to

determine the expected value of this liability as of mid-1997, not the actual value as of 1999 or

2000.  Hindsight bias is to be fought rather than embraced."  Paloian v. LaSalle Bank, N.A., 619

F.3d 688, 693 (7th Cir. 2010) (citation omitted).  Terpstra should have determined the expected

---

[3] The court in McCook Metals was discussing Grochocinski v. Reliant Interactive Media Corp. (In re Gen.
Search.com), 322 B.R. 836, 850 (Bankr. N.D. Ill. 2005), a case which also stated that courts may not arbitrarily reject
uncontroverted evidence and cited the same precedent as Knippen for that proposition.  McCook Metals'
clarification of Gen. Search.com on this point has the same effect as if it clarified Knippen.

value of the Black Flag/Homax litigation as of December 31, 2008, not the actual value that was available to him in 2012.

Nevertheless, Defendants did not contest Terpstra's opinion, either by testimony from their own expert or by argument in their brief. Although counsel asked a number of questions of Terpstra during cross-examination, their failure to raise this issue in post-trial briefing leads the court to conclude that Defendants abandoned the issue. See Lawrence v. Lawrence (In re Lawrence), 237 B.R. 61, 85 n.3 (Bankr. D.N.J. 1999) ("Failure to brief and argue an issue to the trial court results in abandonment of the issue."). Consequently, the court will not inquire further and will accept Terpstra's opinion that Bridgeview was insolvent as early as December 31, 2008.

Even assuming that Bridgeview was insolvent, and that Bridgeview's managing members owed a fiduciary duty to preserve the assets of the corporation for the benefit of creditors, the Committee has not demonstrated that the duty was breached when the 2007 Promissory Note was settled. For the same reasons described above in Count I, Defendants demonstrated that their actions preserved and protected Bridgeview's assets.

The situation in which Bridgeview found itself in April 2009 was far from ideal. Its largest customer had taken it to arbitration. That customer stopped making payments under the 2007 Supply Agreement, leaving Bridgeview with an outstanding account receivable in excess of $1 million. In addition, there were approximately $1.5 million of outstanding receivables that were neither being contested nor being paid, as well as earmarked inventory that was not being accepted. The total outstanding amount was approximately $4.1 million.

Moreover, Bridgeview was losing customers as the litigation with Black Flag became known throughout their industry. More than $13 million of customer revenue was lost as a result of the litigation.

To cap it off, the huge unpaid receivable adversely affected Bridgeview's ability to borrow under the Wells Fargo line of credit. In no uncertain terms, Bridgeview's CFO told John that something drastic had to be done because "it felt like we had really run out of options." Unless immediate action was taken, Bridgeview would be out of business. So John and Linda took action, trading a $3.5 million promissory note that would not bring in any cash for another three and a half years – if Fountainhead could even pay it at that time – for a $700,000 cash infusion. As described more fully in Count I, the decision to take this action did not breach John's or Linda's fiduciary duty to Bridgeview's creditors. Judgment will be entered for the Defendants on Count II.

**Count III**

The settlement of the 2007 Promissory Note was not a fraudulent transfer under § 548(a)(1)(B) by the Fountainhead Group, John Romano and Linda Romano.

The Committee seeks a finding that the settlement of the 2007 Promissory Note was a constructively fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B). This cause of action is based on the Committee's theory that the settlement resulted in a loss to Bridgeview of approximately $2.8 million. In order to succeed on this theory, the Committee must prove that the cash infusion of $700,000 that Bridgeview received from Eugene Romano was not "reasonably equivalent value" for the $3.5 million 2007 Promissory Note.

Pursuant to 11 U.S.C. § 548(a)(1)(B):

(a) (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . .

38

(B)   (i)   received less than a reasonably equivalent value in exchange for such transfer or obligation; and

   (ii)   (I)   was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

      (II)   was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

      (III)   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

      (IV)   made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

This cause of action is often described as "constructive fraud" because there is no element of intent required. Matter of FBN Food Servs., Inc., 82 F.3d 1387, 1394 (7th Cir. 1996).

To prevail, the Committee must prove the following elements: (1) there was a transfer of Bridgeview's property or an interest therein; (2) made within two years of the filing of the bankruptcy petition; (3) for which Bridgeview received less than a reasonably equivalent value in exchange; and (4) either (a) Bridgeview was insolvent at the time, or (b) Bridgeview was left with unreasonably small capital for its business, or (c) Bridgeview intended to incur debts beyond its ability to repay as they matured. See Freeland v. Enodis Corp., 540 F.3d 721, 737 (7th Cir. 2008) (BAPCPA changed the lookback period from one to two years for cases commenced more than one year after the statute's effective date of October 17, 2005). The Committee must prove each element by a preponderance of the evidence. See Baldi v. Lynch (In re McCook Metals, LLC), 319 B.R. 570, 587 (Bankr. N.D. Ill. 2005) ("McCook Lynch").

Defendants first point out that settlement of the 2007 Promissory Note occurred between Fountainhead as the maker, Bridgeview as the holder and Wells Fargo as the secured creditor. John and Linda took actions relating to the settlement, but those actions were done in their

corporate capacity. Therefore, there is no claim against them. The court agrees. Judgment will

be entered in favor of John and Linda on Counts III and IV (discussed below). When

determining Fountainhead's liability, however, the court will look at the actions of those who

controlled it. John was the majority interest holder in Fountainhead, and both he and Linda were

directors and officers. See, e.g., Manning v. Wallace (In re First Fin. Associates, Inc.), 371 B.R.

877, 892-93 (Bankr. N.D. Ind. 2007) ("Many courts have held that in the context of a corporate

debtor, courts may look into the fraudulent intent of its controlling members.").

The Committee must first demonstrate that Bridgeview had an interest in property that

was transferred. In considering the phrase "an interest of the debtor in property" as used in

another avoidance section (11 U.S.C. § 547(b)), the Supreme Court held that property of the

debtor "is best understood as that property that would have been part of the estate had it not been

transferred before the commencement of bankruptcy proceedings." Begier v. I.R.S., 496 U.S.

53, 58 (1990). The Court therefore looked to 11 U.S.C. § 541, which defines "property of the

estate" to include "all legal or equitable interests of the debtor in property as of the

commencement of the case." Id. at 58-59. See Matter of Merchants Grain, Inc., 93 F.3d 1347,

1352 (7th Cir. 1996) (discussing Begier).

Defendants argue that:

> Only Wells Fargo's financial situation was altered by its agreement to settle the
> 2007 Note in exchange for the infusion of the working capital its borrower
> required to survive. Had the settlement not taken place, the Debtors' Estate
> would be in no different position since Wells Fargo, as the under-secured secured
> creditor, would have been entitled to the proceeds of the 2007 Note when it came
> due in November 2012.

Defs.' Post-Trial Br. 23-24. In other words, proceeds from the 2007 Promissory Note were

available only to Wells Fargo, which held a perfected security interest in it. Only if Wells Fargo

was oversecured might the proceeds have been available to other creditors.  It is undisputed that

Wells Fargo was undersecured.

This argument is based on pre-Begier case law holding that "property belongs to the

debtor . . . if its transfer will deprive the bankruptcy estate of something which could otherwise

be used to satisfy the claims of creditors."  Danning v. Bozek (In re Bullion Reserve of N. Am.),

836 F.2d 1214, 1217 (9th Cir.), cert. denied, 486 U.S. 1056 (1988).  Since any funds received on

account of the 2007 Promissory Note could only have been used to satisfy Wells Fargo's claim,

Defendants argue, cancelling the note did not deprive the estate of something which could have

been used to satisfy the claims of unsecured creditors.

But under the Bankruptcy Code, "property of the estate" includes property that is fully

encumbered by a lien.  See United States v. Whiting Pools, Inc., 462 U.S. 198, 203-04 (1983)

("Although Congress might have safeguarded the interests of secured creditors outright by

excluding from the estate any property subject to a secured interest, it chose instead to include

such property in the estate and to provide secured creditors with 'adequate protection' for their

interests." (citing 11 U.S.C. § 363(e))).

Consequently, the 2007 Promissory Note was one of Bridgeview's assets and would

have become property of the estate, albeit fully encumbered property.

"Transfer" is broadly defined under the Bankruptcy Code as including "each mode, direct

or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with

property or an interest in property."  11 U.S.C. § 101(54)(D).  Cancellation of the 2007

Promissory Note constituted a transfer of an interest in property.  See Gen. Search.com, 322 B.R.

at 842-43 (forgiveness of a debt constitutes a transfer for purposes of § 548(a)(1)).

Therefore, cancelling the 2007 Promissory Note was a transfer of an interest of

Bridgeview in property, and the Committee satisfied the first element of § 548(a)(1)(B).

Although it is undisputed that the second and fourth elements of the statute are satisfied –

settlement of the 2007 Promissory Note occurred within two years of Bridgeview's bankruptcy

filing, and the court accepted Terpstra's opinion that Bridgeview was insolvent at least as early

as December 31, 2008 – the Committee's case founders on the third element of its claim.  It

cannot prove by a preponderance of the evidence that Bridgeview received less than a reasonably

equivalent value in exchange for the forgiveness of the 2007 Promissory Note.  See In re Jumer's

Castle Lodge, Inc., 338 B.R. 344, 357-58 (C.D. Ill. 2006) (noting that "it is the party challenging

the allegedly fraudulent transfer that bears the burden of proving that it did not receive

reasonably equivalent value.") (emphasis in original), aff'd sub nom. Creditor's Comm. of

Jumer's Castle Lodge, Inc. v. Jumer, 472 F.3d 943 (7th Cir. 2007).

The test for determining whether reasonably equivalent value was given in the context of

a fraudulent transfer action, the Seventh Circuit has stated, requires courts to "determine the

value of what was transferred and to compare it to what was received."  Barber v. Golden Seed

Co.,, 129 F.3d 382, 387 (7th Cir. 1997), quoted in Jumer, 472 F.3d at 947.  Fountainhead owed

Bridgeview $3.5 million under the 2007 Promissory Note.  In exchange for cancelling the note,

Bridgeview received $700,000 in cash.

But in determining whether reasonably equivalent value was given in exchange for the

transfer, "[t]he focus is on what the debtor surrendered and what he received, regardless of any

benefit flowing to a third party."  Myers v. Malone (In re Malone), No. A12-8002-TLS, 2013

WL 436447, at *6 (Bankr. D. Neb. Feb. 5, 2013).  So what did Bridgeview surrender?  A $3.5

million promissory note for which any proceeds that were ever collected would immediately be

42

turned over to the secured creditor, Wells Fargo.  In return, Bridgeview received $700,000 in

free, available cash which it could spend immediately on operations, hopefully for the benefit of

its unsecured creditors.  Indeed, the terms of the Second Amendment <u>required</u> Bridgeview to use

the $700,000 for "working capital purposes."

The Seventh Circuit also tells us that the test for determining whether "reasonably

equivalent value" was given in return for a transfer "is not a fixed mathematical formula" but

instead:

> [S]hould depend on all the facts of each case, an important element of which is
> fair market value.  Another important factor in assessing reasonably equivalent
> value is whether the sale was an arm's length transaction between a willing buyer
> and a willing seller.  Additionally, other courts have held that the debtor need not
> collect a dollar-for-dollar equivalent to receive reasonably equivalent value.

<u>Barber</u>, 129 F.3d at 387 (internal quotation marks and citations omitted).

The evidence the Committee submitted to value the 2007 Promissory Note was with

respect to the loss Bridgeview recorded on its audited financial statements and the gain that

Fountainhead recognized following the note's cancellation.  Bridgeview recorded an offset to

members' equity of approximately $2,804,326.  As the accountants described the transaction,

since "the note was between related parties, the balance forgiven in 2009 will be recorded as a

reduction in the Company's equity."  Fountainhead recognized a gain to paid-in capital of

$2,788,781, including $47,108 of accrued interest.  The Committee also relies on the fact that

this was not an arm's length transaction, as John and Linda held interests on both sides.

While the accounting recognition of this transaction is interesting, this is not dispositive

as to whether the transaction was for reasonably equivalent value.  "Whether a debtor received a

reasonably equivalent value is analyzed from the point of view of the debtor's creditors, because

the function of this element is to allow avoidance of only those transfers that result in a

diminution of a debtor's prepetition assets." Jordan v. Kroneberger (In re Jordan), 392 B.R. 428,

441 (Bankr. D. Idaho 2008).

> [T]he proper focus is on the net effect of the transfers on the debtor's estate, the
> funds available to the unsecured creditors. As long as the unsecured creditors are
> no worse off because the debtor, and consequently the estate, has received an
> amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

Harman v. First Am. Bank of Maryland (In re Jeffrey Bigelow Design Grp., Inc.), 956 F.2d 479,

484 (4th Cir. 1992). See Leibowitz v. Parkway Bank & Trust Co., 210 B.R. 298, 301 (N.D. Ill.

1997) ("If Debtor's unsecured creditors were (or are) damaged in their ability to collect from

Debtor by virtue of Debtor's transfers to Parkway, then the Transfers were (and are) fraudulent

and may be avoided by the Trustee.") aff'd sub nom. In re Image Worldwide, Ltd., 139 F.3d 574

(7th Cir. 1998).

In this case, Bridgeview's unsecured creditors received reasonably equivalent value from

the transaction because the 2007 Promissory Note was never available to them. "The holder of a

security interest has a superior property interest in the secured item; thus, the item is not

otherwise available to creditors." In re Consol. Pioneer Mortg. Entities, 166 F.3d 342, 1999 WL

23156, at *1 (9th Cir. 1999) (unpublished opinion) (citing In re Acequia, Inc., 34 F.3d 800, 803

(9th Cir.1994)).

If Bridgeview had liquidated the day before cancelling the $3.5 million 2007 Promissory

Note, the undersecured Wells Fargo would have taken the note as partial satisfaction of its debt.

Any recovery from Fountainhead would have reduced Bridgeview's debt to Wells Fargo; none

of it would have been available to the unsecured creditors. But if Bridgeview had liquidated the

day after the $700,000 cash infusion, that money would have been available for unsecured

creditors. Indeed, the whole point of the transaction was to keep Bridgeview as a going concern

until the litigation with Black Flag/Homax could be resolved. Without that cash infusion,

44

Bridgeview would almost certainly have shut down within a matter of days, leaving its

unsecured creditors with nothing. The cash gave Bridgeview a chance to hang on and to

continue operating while the arbitration continued, hopefully with a positive result that would

benefit creditors.

Moreover, even if Bridgeview's unsecured creditors could have expected the full amount

of the $3.5 million to be available, the court has no evidence on the <u>collectability</u> of the 2007

Promissory Note. It was due three and a half years after the cash infusion, with no installment

payments due in the interim. Could Fountainhead have paid the 2007 Promissory Note when it

came due? After all, the cash infusion came directly from Eugene Romano – it was not even

Fountainhead's prepayment. Indeed, the evidence the court <u>does</u> have is that Fountainhead could

not prepay the 2007 Promissory Note, even if it wanted to, due to restrictions imposed by its

lender. Perhaps, three and a half years before the due date, $700,000 was reasonably equivalent

value for the $3.5 million note – but the court should not have to guess.

In its post-trial brief, the Committee criticizes the Defendants for offering "no evidence

or testimony that what Bridgeview received was reasonably equivalent to what it gave up." Post-

Trial Br. of The Official Comm. of Unsecured Creditors 26. But it was the Committee's burden

to prove that Bridgeview received less than a reasonably equivalent value for the transfer, and

this it failed to do.

For the reasons stated above, judgment will be entered for the Defendants on Count III.

**Count IV**

<u>The settlement of the 2007 Promissory Note was not a fraudulent transfer under 740 ILCS
160/5(a)(2) and 160/6 by the Fountainhead Group, John Romano and Linda Romano.</u>

The Committee seeks a finding that the settlement of the 2007 Promissory Note was a

constructively fraudulent transfer under sections 5(a)(2) and 6 of the Illinois Uniform Fraudulent

Transfer Act, 740 ILCS 160/1 *et al.*, and may therefore be avoided by the Committee pursuant to

11 U.S.C. § 544. As in Count III, this cause of action is based on the Committee's theory that

the settlement resulted in a loss to Bridgeview of approximately $2.8 million. The Committee

similarly relies on its contention that the cash infusion of $700,000 that Bridgeview received

from Eugene Romano was not reasonably equivalent value for a note in the amount of $3.5

million.

Pursuant to § 544, a "trustee shall have, as of the commencement of the case, and without

regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid

any transfer of property of the debtor or any obligation incurred by the debtor that is voidable

by," among other entities, an unsecured creditor. See 11 U.S.C. § 544(a); see also id. § 544(b)(1)

("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation

incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured

claim . . . ."). At the time of the settlement of the 2007 Promissory Note, the Pennock Company

was an unsecured creditor in whose shoes a trustee may stand. A debtor-in-possession has the

same rights as a trustee, 11 U.S.C. § 1107, and Bridgeview's right to bring this claim was

assigned to the Committee.

Under 740 ILCS 160/5(a)(2):

(a)    A transfer made or obligation incurred by a debtor is fraudulent as to a
       creditor, whether the creditor's claim arose before or after the transfer was
       made or the obligation was incurred, if the debtor made the transfer or
       incurred the obligation:

       . . . .

       (2)    without receiving a reasonably equivalent value in exchange for
              the transfer or obligation, and the debtor:

              (A)    was engaged or was about to engage in a business or a
                     transaction for which the remaining assets of the debtor were
                     unreasonably small in relation to the business or transaction; or

46

(B)    intended to incur, or believed or reasonably should have
believed that he would incur, debts beyond his ability to pay as
they became due.

The elements of a fraudulent transfer pursuant to 11 U.S.C. § 544 and 740 ILCS

160/5(a)(2) are essentially the same as those under 11 U.S.C. § 548(a)(1)(B). See Baldi v.

Samuel Son & Co., 548 F.3d 579, 581 (7th Cir. 2008). The Illinois statute is based on the

Uniform Fraudulent Transfer Act ("*UFTA*"), which was an effort to harmonize state law with the

Bankruptcy Code. See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.),

139 F.3d 574, 577 (7th Cir. 1998).

A key difference between the two statutes exists, however, based on their language and

accompanying definitions. As a result of this difference, Defendants' argument that there was no

transfer finds traction under the UFTA, even though it did not succeed under § 548.

Under Illinois law, a "transfer" is defined as "every mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing of or parting **with an asset or an interest in**

**an asset** . . . ." 740 ILCS 160/2(l) (emphasis added). In contrast, the Bankruptcy Code's

definition of transfer refers to disposing of or parting with **property** or an interest in **property**.

See 11 U.S.C. § 101(54). Therefore, the Supreme Court's interpretation of property by reference

to the types of interests that would have constituted "property of the estate" is relevant to

understanding the Bankruptcy Code's fraudulent transfer statute at issue in Count III, see Begier,

496 U.S. at 58-59, but not for understanding Illinois's fraudulent transfer statute. Instead, the

relevant term for purposes of the Illinois law is "asset."

According to the definitions section of Illinois' fraudulent transfer statute, "'[a]sset'

means property of a debtor, but the term does not include . . . property to the extent it is

encumbered by a valid lien . . . ." 740 ILCS 160/2(b)(1). Consequently, "if the lien amount

exceeds the asset value at the time of the transfer, no 'assets' were transferred and no claim

under the UFTA is viable." Rafool v. Propack Sys., LLC (In re Fleming Packaging Corp.), No.
03-82408, 2007 WL 1021884, at *8 (Bankr. C.D. Ill. March 30, 2007) (citation omitted).

In this case, there is no dispute that the amount of Wells Fargo's lien far exceeded the
face value of the 2007 Promissory Note. Thus, the property interest of the Debtor at issue in the
settlement of the 2007 Promissory Note could not give rise to a cause of action under Illinois'
fraudulent transfer statute, whether this action is brought directly or derivatively pursuant to the
trustee's powers under 11 U.S.C. § 544(b); the reasons behind this conclusion have been
described by the court in Fleming Packaging:

> The TRUSTEE argues that an asset is property of the estate under the Bankruptcy
> Code even if it is fully encumbered. When bringing an avoidance action under
> Section 544(b), however, the extent of the trustee's rights is determined entirely
> by state law. Section 544(b) confers upon the trustee no greater rights of
> avoidance than an actual creditor would have if it were asserting the claim on its
> own behalf. The UFTA's definition of 'asset' clearly and unambiguously
> excludes encumbered property. The TRUSTEE is subject to that exclusion the
> same as any creditor suing in state court.

Id. at *9 (internal citation omitted). See also Nova Chemicals, Inc. v. Frawley, No. 02 C 3661,
2003 WL 22382998, at *5 (N.D. Ill. Oct. 16, 2003) ("[I]f the property at issue is not an asset,
then the UFTA does not apply.").

Therefore, the Committee cannot prove by a preponderance of the evidence that a transfer
of an asset or of an interest in an asset occurred for purposes of an avoidance action under 11
U.S.C. § 544 and Illinois fraudulent transfer law.

Additionally, as described above in Count III, the Committee did not prove by a
preponderance of the evidence that Bridgeview received less than a reasonably equivalent value
when it received the $700,000 cash infusion in return for cancelling the $3.5 million 2007
Promissory Note, on which no payments were due for three and a half years. Without this
crucial factor, the Committee cannot prevail under 740 ILCS 160/5(a)(2).

48

For the reasons stated above, judgment will be entered for the Defendants on Count IV.

## Count V

The Committee is not entitled to recover from Fountainhead, John Romano and Linda Romano the value of the transfer sought to be avoided pursuant to Counts III and IV.

Since no transfer is avoided pursuant to Counts III and IV, the Committee is not entitled to recover anything under those causes of action. Judgment will be entered for the Defendants on Count V.

## Count VI

The Bunno Payments were fraudulent transfers pursuant to § 548(a)(1)(B).

The elements of this claim are the same as in Count III. The Committee must prove that: (1) the Bunno Payments were transfers of Bridgeview's property; (2) made within two years of the filing of the bankruptcy petition; (3) for which Bridgeview received less than a reasonably equivalent value in exchange; and (4) either (a) Bridgeview was insolvent at the time, or (b) Bridgeview was left with unreasonably small capital for its business, or (c) Bridgeview intended to incur debts beyond its ability to repay as they matured. See Freeland, 540 F.3d at 737.

There is no dispute that the Bunno Payments were transfers of Bridgeview's available cash and that Bridgeview made the Bunno Payments within two years of the filing of the bankruptcy petition. Therefore, the first two elements of the statute are satisfied.

As described in Count II, the court accepted Terpstra's opinion that Bridgeview was insolvent as early as December 31, 2008. Therefore, the fourth element is satisfied as well.

The only remaining question is whether Bridgeview received less than a reasonably equivalent value in exchange for the Bunno Payments. As noted in Count III, it is the Committee's burden to prove a lack of reasonably equivalent value. Frankly, the evidence

suggests that Bridgeview received little if any value at all from what appear to be disguised mortgage payments for John's benefit alone.

As discussed at length in Count IX below, there is no credible evidence to support a finding that the Bunno Payments were either rent or compensation. During discovery, Defendants asserted under oath that the payments constituted payment of rent for office space and accommodations for John Romano when in Chicago performing services as CEO of Bridgeview. The story changed at trial, when John testified that the payments represented his salary. Yet there were no W-2s, 1099s or tax returns to support this theory, which could have been very simple to prove.

John also testified that he stayed in the condominium when he visited Bridgeview. Were the Bunno Payments, totaling over $100,000, reasonable or fair market rental value for those visits? How much time did John actually spend in Chicago and how much would a comparable hotel room have cost? Linda testified that she and other Fountainhead employees stayed at the property. Did that provide any benefit to Bridgeview? Wouldn't Fountainhead have paid for their lodging?

Finally, it is suspicious that even when Bridgeview was in desperate financial straits, the Bunno Payments were a top priority. As McGonigle testified, if the payment was not in on time, one of The Fountainhead Group accountants would call "saying that, you know, we had to make a payment, that Mr. Romano was looking for the payment so that he could pay the – whatever, you know, expenses related to the condo."

For all of these reasons, the court finds that the Committee established that Bridgeview received less than a reasonably equivalent value in exchange for the Bunno Payments. To the extent that Bridgeview would have paid for a hotel room for its CEO (John), a visiting IT

50

consultant (Jackie) or its general counsel (Linda) and did not need to do so because those visitors stayed at the condominium, Bridgeview might have received some benefit for those payments. But the court has no evidence regarding the cost of the hotel lodging that Bridgeview allegedly saved by "renting" Bunno's condominium. All four elements of the statute have been satisfied, and the court will enter judgment for the Committee on Count VI in the full amount of the Bunno Payments.

**Count VII**

The Bunno Payments were fraudulent transfers pursuant to 740 ILCS 160/5(a)(2) and 160/6.

As described more fully in Count IV, the elements of a fraudulent transfer pursuant to 11 U.S.C. § 544 and 740 ILCS 160/5(a)(2) are essentially the same as those under 11 U.S.C. § 548(a)(1)(B). See Baldi, 548 F.3d at 581. Having found the Bunno Payments to be fraudulent transfers under § 548(a)(1)(B), the court finds them to be fraudulent transfers pursuant to 740 ILCS 160/5(a)(2).

The Bunno Payments are also actionable under 740 ILCS 160/6, which "applies only to claims arising before an allegedly fraudulent transfer and includes the additional requirement that the debtor must be insolvent at the time of the transfer or become insolvent as a result of the transfer." Fed. Deposit Ins. Corp. v. FBOP Corp., No. 14 C 4307, 2015 WL 1538802, at *7 (N.D. Ill. Mar. 31, 2015). As noted in Count IV, the Committee may assert the rights of a creditor that held a claim at the time the Bunno Payments were made. The Committee established that Bridgeview was insolvent at the time of the Bunno Payments. Therefore, the Bunno Payments were fraudulent transfers under 740 ILCS 160/6 as well.

For all of the reasons stated above, the court will enter judgment for the Committee on Count VII.

**Count VIII**

<u>The Committee is entitled to recover from Bunno and from John Romano the value of the
transfers avoided pursuant to Counts VI and VII.</u>

In Count VIII, the Committee seeks to recover the value of the Bunno Payments pursuant

to 11 U.S.C. § 550, the relevant part of which provides as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is
avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title,
the trustee may recover, for the benefit of the estate, the property transferred,
or, if the court so orders, the value of such property, from –

 (1) the initial transferee of such transfer or the entity for whose benefit
 such transfer was made; or

 (2) any immediate or mediate transferee of such initial transferee.

According to the complaint, the Committee sought relief against Bunno, John Romano

and Linda Romano.  Linda Romano, however, is not mentioned in the Committee Brief.  It

appears that the Committee no longer seeks recovery of the Bunno Payments from Linda

Romano, which is appropriate since there is no evidence that she was a transferee.  Linda was

not a director or officer of Bunno, and she held no membership interest in it.

Bridgeview made the Bunno Payments directly to Bunno.  Therefore, Bunno is the initial

transferee of the transfers avoided as fraudulent under Counts VI and VII.  See <u>Bonded Fin.

Servs., Inc. v. European Am. Bank</u>, 838 F.2d 890, 893 (7th Cir. 1988) ("[T]he minimum

requirement of status as a 'transferee' is dominion over the money or other asset, the right to put

the money to one's own purposes.").  Accordingly, the Committee may recover the full amount

of the Bunno Payments, $104,166.60, from Bunno as the initial transferee of avoided fraudulent

transfers.

The Committee also seeks to recover the Bunno Payments from John Romano as a person

"for whose benefit such transfer was made," <u>see</u> § 550(a)(1), also known as a "transfer

beneficiary." A transfer beneficiary is "someone who receives the benefit but not the money."

Bonded, 838 F.2d at 895. See also Danning v. Miller (In re Bullion Reserve of N. Am.), 922

F.2d 544, 547 (9th Cir. 1991) ("[T]he entity for whose benefit the transfer was made is different

from a transferee, immediate or otherwise. 'Someone who receives the money later on is not an

'entity for whose benefit such transfer was made'; only a person who receives a benefit from the

initial transfer is within this language.'" (quoting Bonded, 838 F.2d at 896)). The paradigm

example of a transfer beneficiary is a guarantor. When the guaranteed debt is paid, the guarantor

has not received the money, but it did receive a benefit – release from its guarantee. See

Bonded, 838 F.2d at 895.

Bonded raised more questions than it answered, because it determined that the entity

under consideration was not in fact a transfer beneficiary but instead a transferee. But Judge

Wedoff took up the laboring oar in identifying three factors that mark an entity as a transfer

beneficiary: (1) the benefit must actually have been received by the beneficiary, not just

intended; (2) the benefit must be quantifiable; and (3) the benefit must be accessible to the

beneficiary. See McCook Lynch, 319 B.R. at 590-92 (Bankr. N.D. Ill. 2005).

John was the 100% owner of Bunno Boarding. Does that mean that John received a

benefit from the Bunno Payments? The Committee argues that it does, but "[i]f your interest in

an entity makes you strictly liable (jointly and severally with the entity) under § 550 every time

the entity receives a fraudulent conveyance, wouldn't the same logic extend liability to every

shareholder of a corporation to the same degree?" Turner v. Phoenix Fin., LLC (In re Imageset,

Inc.), 299 B.R. 709, 718 (Bankr. D. Me. 2003).

In this case, however, there is no danger that imposing liability on John as a transfer

beneficiary ignores the limited liability form shared by corporations and LLCs. John's liability

is attributable not only to his membership interest in Bunno. "Something more than mere status

as a shareholder, officer, or director" is easily shown. See Schechter v. 5841 Building Corp. (In

re Hansen), 341 B.R. 638, 645 (Bankr. N.D. Ill. 2006).

Not only did John have complete control over Bunno and its sole asset, but the company

itself was nothing more than a shell created for tax purposes. John testified that when he bought

Bridgeview, he determined that he would receive $125,000 as his salary and that he would use

that money to purchase a condominium in Chicago. Immediately after John testified that the

payments made to Bunno each year were actually his salary, counsel for the Committee

examined him about his responses to interrogatories propounded during discovery.

In discovery, the Committee had sought all facts supporting Defendants' contention that

the Bunno Payments were made in the ordinary course of business. According to Defendants'

response, the payments "constituted payment of rent for office space and accommodations for

John Romano when in Chicago performing services as CEO of Bridgeview and thus constitute

payments in the ordinary course of business." Defendants gave the same response when asked to

state the basis for their contention that the Bunno Payments were made according to ordinary

business terms.

Which story is the court to believe, the original one offered during discovery that the

payments constituted payment of rent, or the one that developed during trial that the payments

were John's compensation? Both versions were told under oath. The LLC's name may provide

a clue – Bunno **Boarding**. This implies that the purpose of the company was to provide lodging,

which is consistent with Defendants' first explanation.

In any event, Bunno's sole asset was a condominium located at 1212 North Lake Shore

Drive, Unit 12AS, Chicago, Illinois. There was no evidence that Bunno was an operating

company or had any other function whatsoever aside from holding title to that condominium.

Whether the court accepts the story that the payments were rent, or the story that the payments

were compensation, or neither story, it appears that there was no purpose to Bunno other than

owning the condominium and receiving these payments from Bridgeview.

Therefore, John actually received the benefit of the Bunno Payments.

John's benefit was quantifiable, because it is represented by the $104,166.10 that Bunno

received from Bridgeview. Finally, as mentioned above, the benefit was accessible to John as

the sole member of the LLC. He had complete control over the management, operations and

property, and thus access to the benefit from the Bunno Payments. See McCook Lynch, 319

B.R. at 592.

Therefore, John is a transfer beneficiary and the Bunno Payments are recoverable from

him as well as Bunno Boarding. Of course, the Committee "is entitled to only a single

satisfaction" under this count. 11 U.S.C. § 550(d).

Although the Bankruptcy Code does not specifically provide that courts may award

prejudgment interest, the Seventh Circuit has recognized that bankruptcy courts have discretion

to do so as part of a compensation entitlement. See Matter of Milwaukee Cheese Wisconsin,

Inc., 112 F.3d 845, 849 (7th Cir. 1997) ("Discretion must be exercised according to law, which

means that prejudgment interest should be awarded unless there is a sound reason not to do so.").

"The purpose of allowing prejudgment interest is to enable a prevailing plaintiff to be made

whole in the absence of countervailing equities or statutory prohibition. Prejudgment interest is

essential to compensate the prevailing party for the lost time value of money." Carmel v. River

Bank America (In re FBN Food Services, Inc.), 175 B.R. 671, 690-91 (Bankr. N.D. Ill. 1994)

(citations omitted).

In accordance with these principles, the court awards pre-judgment interest at the prime rate commencing from the date of the filing of the adversary proceeding, October 28, 2011.  See Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 436 (7th Cir. 1989) (suggesting judges use the prime rate for fixing prejudgment interest where no statutory rate of interest is prescribed).  In light of the delay in ruling occasioned by the question of this court's authority to enter a final judgment, the accumulation of interest is suspended for the period from September 5, 2013 to June 19, 2014.

## Count IX

Transfers of over $104,166 to Bunno from Bridgeview were preferential transfers pursuant to § 547(b).

The Committee seeks to avoid Bridgeview's payments to Bunno as preferential transfers pursuant to 11 U.S.C. § 547(b):

> Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
>
> **(1)** to or for the benefit of a creditor;
>
> **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> **(3)** made while the debtor was insolvent;
>
> **(4)** made--
>
> > **(A)** on or within 90 days before the date of the filing of the petition; or
> >
> > **(B)** between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> **(5)** that enables such creditor to receive more than such creditor would receive if--
>
> > **(A)** the case were a case under chapter 7 of this title;
> >
> > **(B)** the transfer had not been made; and

**(C)** such creditor received payment of such debt to the extent provided by the provisions of this title.

"This general provision is designed to prevent a debtor approaching bankruptcy from choosing on its own to favor some creditors at the expense of others in ways that are not consistent with the priorities and preferences of bankruptcy law." Grede v. FCStone, LLC, 746 F. 3d 244, 251 (7th Cir. 2014) (citation omitted).

Pursuant to § 547(g), "the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section." 11 U.S.C. § 547(g).  The burden is on the Committee to prove the elements of § 547(b) by a preponderance of the evidence. See Maxwell v. IDC (In re marchFirst, Inc.), 381 B.R. 689, 694 (Bankr. N.D. Ill. 2008).

In their post-trial brief, Defendants assumed without discussion that the requirements of § 547(b) were satisfied, and devoted their analysis to the application of the ordinary course of business defense, see 11 U.S.C. § 547(c)(2).  The court will do the same.  Defendants must prove this defense by a preponderance of the evidence.  See Matter of Midway Airlines, Inc., 69 F.3d 792, 797 (7th Cir. 1995).

Defendants asserted that the Bunno Payments were either John's compensation, or in the alternative, rent payments, and that they therefore satisfy the requirements of the ordinary course of business defense, because: (1) the underlying debt was incurred by Bridgeview in the ordinary course of its business or financial affairs, and (2) the Bunno Payments were made in the ordinary course of Bridgeview's and Bunno Boarding's business or financial affairs, or according to ordinary business terms.  See 11 U.S.C. § 547(c)(2).

The court will first proceed under the argument that the Bunno Payments were John's

compensation.  Salary payments often qualify as transfers in the ordinary course of business.

See Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC), 458 B.R. 87, 118 n.22 (Bankr.

S.D.N.Y. 2011).

John testified that his salary as Bridgeview's CEO was $125,000 per year, and that he

was going to use that money to purchase a condominium that Fountainhead employees could

stay in when working at Bridgeview.

Providing evidence that funds received represent salary payments is not difficult.  A

defendant might introduce his W-2, or a portion of his tax return, or copies of paystubs.  Yet

John submitted no documentary evidence in support of his claim that these payments represented

his compensation, so this claim – raised for the first time at trial, in contradiction of the response

provided during discovery and under oath that the payments constituted rent – is not credible.

Furthermore, John testified that his accountant told him to set up ownership of the

condominium as an LLC.  But he introduced no evidence to show that such a setup – if in fact it

did represent his compensation – was made in the ordinary course of Bridgeview's and Bunno

Boarding's business or financial affairs, or was made according to ordinary business terms.

To determine whether the payments at issue were made and received in the ordinary

course of Bridgeview and Bunno Boarding's business, "the court must make a factual inquiry

into the prior dealings between the parties." Maxwell v. Space, LLC (In re marchFirst, Inc.), No.

01 B 24742, 2008 WL 1804105, at *3 (Bankr. N.D. Ill. April 18, 2008) (quoting Cassirer v.

Herskowitz (In re Schick), 234 B.R. 337, 348 (Bankr. S.D.N.Y. 1999)).  Defendants introduced

no evidence in support of the parties' prior dealings, if any, that would enable this court to

determine that the transactions "conform to the norm established by the debtor and the creditor in

the period before, preferably well before, the preference period." Matter of Tolona Pizza
Products Corp., 3 F.3d 1029, 1032 (7th Cir. 1993).

Neither did the Defendants introduce any objective evidence that the payments were
made according to ordinary business terms. See 11 U.S.C. § 547(c)(2)(B). As the Seventh
Circuit told us, "'ordinary business terms' refers to the *range* of terms that encompasses the
practices in which firms similar in some general way to the creditor in question engage, and . . .
only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary
and therefore outside the scope of [§ 547(c)(2)]." Tolona Pizza, 3 F.3d at 1033 (emphasis in
original).

If these payments were actually meant to be John's compensation, there should be
evidence to support a finding that other firms compensate their CEOs in this manner. Although
the standard for finding a practice to be outside ordinary business terms is generous, without any
evidence at all this arrangement cannot satisfy it.

What if the payments were actually rent payments to Bunno in return for the use of the
condominium? In discovery, the Committee asked Defendants to answer an interrogatory
seeking all facts supporting their contentions that the Bunno Payments were made in the ordinary
course of business. According to Defendants' response, "[t]he payments constituted payment of
rent for office space and accommodations for John Romano when in Chicago performing
services as CEO of Bridgeview and thus constitute payments in the ordinary course of business."

John was the only Bridgeview employee who stayed in the condominium. When asked
whether any other Bridgeview employees used it, John said, "[t]hey all lived in Chicago, so I
don't see why they would."

So we have a piece of real estate for which Bridgeview was paying $125,000 per year. Its CEO was the only member of the LLC whose sole asset was that real estate. No lease was produced. It strains credulity to believe that these payments constituted rent.

Even if the court suspended its disbelief, Defendants failed to introduce any evidence that would satisfy the requirements of the ordinary course of business defense: (1) that the rent was incurred by Bridgeview in the ordinary course of its business or financial affairs; and (2) that the rent payments were made in the ordinary course of Bridgeview's and Bunno's business or financial affairs or that the rent payments were made according to ordinary business terms.

For all of the reasons stated above, the court finds that the transfers of over $104,166 to Bunno from Bridgeview were preferential transfers pursuant to § 547(b).

## Count X

<u>The Committee is entitled to recover these preferential transfers from Bunno Boarding and John Romano.</u>

In Count X, the Committee seeks to recover the value of the Bunno Payments pursuant to 11 U.S.C. § 550, which is quoted above in Count VIII.

Bridgeview made the Bunno Payments directly to Bunno. Therefore, Bunno is the initial transferee. The court finds that the Committee shall recover the full amount of the Bunno Payments, $104,166.60, from Bunno as the initial transferee.

As discussed more thoroughly in Count VIII, John is a person "for whose benefit such transfer was made," also known as a "transfer beneficiary." The court finds that the Committee shall recover the Bunno Payments from John as well, although as stated in Count VIII, the Committee "is entitled to only a single satisfaction" under this count. 11 U.S.C. § 550(d).

Finally, as stated in Count VIII, prejudgment interest is awarded at the prime rate, commencing from the date of demand for return of the transfer (May 12, 2011) until the date of

judgment. See Schwinn Plan Comm. v. AFS Cycle & Co, Ltd. (In re Schwinn Bicycle Co.), 205

B.R. 557, 574 (Bankr. N.D. Ill. 1997) ("[I]t has properly been held in actions to recover a

preferential transfers [sic] that the victorious plaintiff is entitled to prejudgment interest from the

date of demand for return or, if no demand was made, from commencement of the adversary

proceeding."). In light of the delay in ruling occasioned by the question of this court's authority

to enter a final judgment, the accumulation of interest is suspended for the period from

September 5, 2013, to June 19, 2014.

**AFFIRMATIVE DEFENSES**

The Defendants raised eleven affirmative defenses in their answer. New value, ordinary

course of business and ordinary business terms are defenses to the preference counts against

Bunno Boarding, and were addressed in the section on Count IX. The affirmative defenses that

some of the transfers do not qualify as transfers, that Bridgeview received reasonably equivalent

value, that Bridgeview was not insolvent and that unsecured creditors were not damaged by

settling the 2007 Promissory Note were also analyzed and resolved in the preceding discussion.

The remaining affirmative defenses relate only to settlement of the 2007 Promissory

Note. As the court will enter judgment for Defendants on all counts relating to settlement of the

2007 Promissory Note, it is unnecessary to address these affirmative defenses.

Nevertheless, in the interests of a complete review, the court will analyze the one

affirmative defense that was clearly addressed in Defendants' Brief as well as in supplemental

briefing by both parties: Whether the Committee's claims are barred by the doctrine of accord

and satisfaction.

The Committee's Claims are not Barred by the Doctrine of Accord and Satisfaction

Defendants argue that "[g]ranting the money judgment sought by the Committee would result in a windfall to Wells Fargo, which has financed this litigation and would receive two-thirds of the net recovery on a claim that it is estopped by the doctrine of accord and satisfaction from pursuing." Defs.' Post-Trial Br. 28-29.

In support of their position that "any claim Wells Fargo might try to assert to recover the balance of the 2007 Promissory Note would be barred by accord and satisfaction since, by entering into the Second Amendment, Wells Fargo agreed to the discharge of the 2007 Promissory Note for less than was originally due," id. at 30-31, Defendants cite Holman v. Simborg, 504 N.E.2d 967, 969 (Ill. App. Ct. 1987): "An accord and satisfaction is generally defined as an agreement to discharge a debt or claim by some performance other than that which was originally due."

The Illinois Supreme Court refined the definition of accord and satisfaction several years after Holman:

> An accord and satisfaction is a contractual method of discharging a debt or claim. To constitute an accord and satisfaction there must be: (1) a *bona fide* dispute, (2) an unliquidated sum, (3) consideration, (4) a shared and mutual intent to compromise the claim, and (5) execution of the agreement.

Saichek v. Lupa, 787 N.E.2d 827, 832 (Ill. 2003) (citation omitted) (emphasis in original). There was no bona fide dispute here. The amount of the 2007 Promissory Note was fixed.

More importantly, the claim that was discharged was the unpaid portion of the 2007 Promissory Note. The Committee is not seeking to recover that unpaid debt under contract law. Instead, its claims are based on theories of fraudulent transfer and breach of fiduciary duty. Defendants produced no evidence in support of an argument that these types of claims were

released by the Second Amendment and thus barred.  The reasoning of the court in <u>Solomon</u> is

instructive in this respect:

> The language of the checks the landlord sent to the tenants clearly refer to
> plaintiffs' security deposits being paid in full. However, this language does not
> establish that the landlord intended that cashing the checks would extinguish the
> plaintiffs' claims for landlord's failure to refund the security deposit within the
> time prescribed by law. . . . [T]his case is more similar to <u>Holman</u>, in which this
> court held that the specific language of a judgment order fully satisfied a
> negligence claim, but did not bar a Structural Work Act claim.  In this case, even
> if the check operated as an accord and satisfaction of a claim to the security
> deposit refund, it did not operate to preclude the statutory claim that defendant
> failed to provide the refund within the time specified in the ordinance.
> . . . .
> This court must seek a reasonable interpretation of a contract, and a strong
> presumption exists against provisions which could easily have been included in
> the agreement.

<u>Solomon v. Am. Nat. Bank & Trust Co.</u>, 612 N.E.2d 3, 6 (Ill. App. Ct. 1993) (citations omitted).

Similarly, the agreement to cancel the 2007 Promissory Note satisfied a contract claim

for the remaining portion of the debt.  It did not bar claims sounding in fraudulent transfer or

breach of fiduciary duty.  <u>See also</u> <u>In re Midway Motors Sales, Inc.</u>, 407 B.R. 442, 2009 WL

1940719, *8 (B.A.P. 6th Cir. July 6, 2009) (unpublished opinion) (noting that the defense of

accord and satisfaction is not available in a fraudulent transfer action because even if the

elements of that affirmative defense are satisfied, the court must still determine whether

reasonably equivalent value was exchanged).

Therefore, the Committee's claims are not barred by the doctrine of accord and

satisfaction.

## CONCLUSION

For all of the reasons stated above, the court will enter judgment in favor of Defendants on Counts I (in part), II, III, IV and V.  The court will enter judgment in favor of Plaintiffs on Counts I (in part), VI, VII, VIII, IX and X.  A separate Judgment Order will be entered concurrently with this Memorandum Opinion.

Date: _____ 9/28/2015 _____       _____
                                               PAMELA S. HOLLIS
                                               United States Bankruptcy Judge